(July 9, 1897.)

COHN v. KINGSLEY.

[49 Pac. 985.]

CONSTITUTIONAL LAW—PROVISIONS THAT ARE MANDATORY.—The provisions of the constitution requiring three several readings, the printing of bills, and an aye and nay vote on final passage of any bill, are mandatory.

LEGISLATURE IN PASSING AN ACT MUST COMPLY WITH PROVISIONS OF CONSTITUTION.—To ascertain whether or not the legislature, in the passage of a bill, complied with the requirements of the constitution, the court may go back of the enrolled bill to see if the journals of both Houses of the legislature show that the require-

ments of the constitution were obeyed in the passage of the act in question.

What the Journal of Legislature must Show.—The journal of both Houses of the legislature must affirmatively show that the provisions of the constitution in regard to the passage of any law were substantially followed by the legislature in the passage of an act, the validity of which is questioned.

Same.—While the journals of both Houses of the legislature are entitled to absolute verity, and cannot be contradicted, yet if the journals fail to show that any step required by the constitution in the passage of a law was taken, such failure to show that such step was taken is conclusive evidence that it was not taken.

How Only Provisions of Constitution may be Suspended.—Neither House of the legislature can suspend the provisions of the constitution which requires three readings on separate days in each House, except in case of urgency, and then only on an aye, and nay vote by two-thirds of the House, voting with reference to only one bill then before each house.

(Syllabus by the court.)

APPEAL from District Court, Ada County.

W. E. Borah, A. A. Fraser and Hawley & Puckett, for Appellant.

The supreme court of Idaho has said: "It seems to be well settled that the court will take judicial knowledge of the journal of a legislative body to determine whether the act of a legislature is constitutionally passed and for the purpose of determining what has been done by the legislature." (*Burkhart v. Reed,* 2 Idaho, 503, 22 Pac. 1.)   The following decisions by our supreme court are to the same effect: *Clough v. Curtis,* 2 Idaho, 522, 22 Pac. 8; *Blaine County v. Heard,* ante, p. 6, 45 Pac. 890; *Wright v. Kelly,* 4 Idaho, 624, 43 Pac. 565; *Bellevue W. Co. v. Stockslager,* 4 Idaho, 636, 43 Pac. 568. The constitution requires each House to keep a journal and declares that certain facts made essential to the passage of a law shall be stated therein. If these facts are not set forth, the conclusion is that they did not transpire.   The journal is made up under the immediate direction of the House and is presumed to contain a full and complete history of its proceedings. When a contest arises as to whether the act was thus passed the journal may be appealed to to settle it.   It is the evidence of the action of the House and by it the act must be sustained or fall.   (*Spangler v. Jacoby,* 14 Ill. 297, 58 Am. Dec. 571, and

note; *Santa Clara Railroad Tax Case,* 9 Saw. 165, 18 Fed. 385; *Hunt v. State,* 22 Tex. App. 396, 3 S. W. 233; *Union Bank v. Commissioners,* 119 N. C. 214, 25 S. E. 966, citing all the authorities; *H. & T. C. R. Ry. Co. v. Odum,* 53 Tex. 343; *State v. Platt,* 2 S. C. 150, 16 Am. Rep. 647; *People v. Starne,* 35 Ill. 140, 85 Am. Dec. 348, and note; *Ryan v. Lynch,* 68 Ill. 162; *Burr v. Ross,* 19 Ark. 250; *Southwark Bank v. Commonwealth,* 26 Pa. St. 446; *Green v. Graves,* 1 Doug. 351; *Opinion of Justices,* 35 N. H. 579; *State v. Francis;* 26 Kan. 731; *State v. Buckley,* 54 Ala. 613; *Perry v. Railroad Co.,* 58 Ala. 546; *State v. McConnell,* 3 Lea, 322; *Williams v. State,* 6 Lea, 549.)

Section 15, article 3 of the constitution of the state of Idaho is as follows: "No law shall be passed except by bill, nor shall any bill be put upon its final passage until the same, with the amendments thereto, shall have been printed for the use of the members, nor shall any bill become a law unless the same shall have been read on three several days in each House previous to the final vote thereon." The appellant contends that this provision of our constitution is a limitation upon the powers of the legislature. (*Field v. People,* 2 Scam. 79; *Burritt v. Commissioners,* 120 Ill. 322, 11 N. E. 180, and cases there cited.) We also contend that this provision of our constitution is mandatory. (*Jones v. Hutchinson,* 43 Ala. 712; *Moody v. State,* 48 Ala. 115, 17 Am. Rep. 28; *Burritt v. Commissioners,* 120 Ill. 322, 11 N. E. 180; *Lincoln v. Haugan,* 45 Minn. 451, 48 N. W. 196; Cooley's Constitutional Limitations, sec. 171; *Supervisors v. Heenen,* 2 Minn. 281, 330; *State v. Patterson,* 98 N. C. 660; 4 S. E. 350.) Nor can the courts enlarge the scope of the title. They are possessed with no dispensing power. The constitution has made the title the conclusive index to the legislative intent as to what shall have operation. It is no answer to say that the title might have been more comprehensive, if, in fact, the legislature have not seen fit to make it so. The supreme court of Pennsylvania, speaking with reference to this provision of the constitution, says: "It is enough for us to know that it is an express mandate of the organic law, which the legislature ought to obey, and the courts are bound to enforce." (*In re Road v. Phoenixville,* 109 Pa. St. 144; *Montgomery v. State,* 88 Ala. 141, 7 South. 51; *State v. Hallock,* 19 Nev. 384, 12

Pac. 832; *State v. Hoadley,* 20 Nev. 317, 22 Pac. 99; *Board of Supervisors v. McGruder,* 84 Va. 828, 6 S. E. 232; *Lane v. State,* 49 N. J. L. 673, 10 Atl. 360; *Ryerson v. Utley,* 16 Mich. 269; *Carter Co. v. Sinton,* 120 U. S. 517, 7 Sup. Ct. Rep. 650; ·*Montclair v. Ramsdell,* 107 U. S. 147, 2 Sup. Ct. Rep. 391; *Ex parte Thomason,* 16 Neb. 238, 20 N. W. 312.)

Attorney General R. E. McFarland, for the Respondent.

This case is submitted on an agreed statement of facts and involves the validity of the act of the legislature, approved March 12, 1897, regulating the fees and compensation of the various county and precinct officers within the state of Idaho, also the applicability of the provisions of said act to officers who were elected, qualified, and acting prior to the passage of said law. In considering the first proposition the following ques- tions arise: 1. Can the court go behind the enrolled bill and to the journal of each House of the legislature when inquiring into the question as to whether the constitutional requirements were complied with in the passage of the bill and for the purpose of passing upon the validity of the act? 2. If the court can go behind the enrolled bill to the journals, is the act void by rea- son of a failure of the journals to show a compliance with the requirements of the constitution in the passage of the bill? Upon the first question, the authorities are not uniform. Many courts hold that a court may go behind the enrolled bill and look into the journal, but we respectfully submit that the better authorities and the weight of reasoning hold that the enrolled law is conclusive evidence of its due passage. (*Sher- man v. Story,* 30 Cal. 253, 89 Am. Dec. 93; *People v. Burt,* 43 Cal. 560; *Green v. Weller,* 32 Miss. 620; *Territory ex rel. Mc- Mahon v. O'Connor,* 5 Dak. 397; 41 N. W. 746; *Pangborn v. Young,* 32 N. J. L. 29; *Louisiana Lottery Co. v. Rich- oux,* 23 La. Ann. 743, 8 Am. Rep. 602; *Swan v. Buck,* 40 Miss. 268; *Ex parte Wren,* 63 Miss. 512, 56 Am. Rep. 825; *Pacific R. R. Co. v. Governor,* 23 Mo. 353, 66 Am. Dec. 673; *State v. Swift,* 10 Nev. 176, 21 Am. Rep. 721; *Evans v. Brown,* 30 Ind. 574; *Dincomb v. Prindle,* 12 Iowa, 1; *Koehler v. Hill,* 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; *Mayor v. Harwood,* 32 Md. 471, 3 Am. Rep. 161; *People v. Devlin,* 32 N. Y. 269; *Broadnax*

v. Groom, 64 N. C. 244; Miller v. State, 3 Ohio St. 475.) The constitution nowhere prescribes what the journal of each House shall contain except in certain particulars. It was no doubt intended by the framers of the constitution to require a journal to be kept by each House, showing the history of each legislative enactment and the proceedings through which· it passed; but we do not concede that this provision of the constitution was intended to render invalid a legislative enactment when the journal does not show affirmatively a full compliance with each constitutional requirement when the constitution itself does not require the journal so to show. (State v. Illinois Cent. R. R. Co., 33 Fed. 730; In re Roberts, 5 Colo. 525.) As all particulars of compliance with the constitution are not specifically required to be entered upon the journals, such compliance will be presumed in the absence of proof to the contrary; the silence of the journals will not be accepted as proof that a proceeding required and not found recorded was omitted, even though it be a proceeding required in the two Houses, and such as would have appeared in the journals if occurred and they contained a memorial of all that was done. (Sutherland on Statutory Construction, sec. 47, p. 48; Black on Interpretation of Laws, 225; Bond Debt Cases, 12 S. C. 200.) Under a constitution which requires certain proceedings to be had before the passage of a bill, but which does not provide that such proceedings shall be entered upon the journals, the presumption always is, when an act, as signed and enrolled, does not show the contrary, it has gone through all necessary formalities. (Cooley's Constitutional Limitations, 163, 167; Sutherland on Statutory Construction, secs. 46, 47, p. 47; Black on Interpretation of Laws, sec. 13, p. 21; State v. McConnell, 3 Lea, 341; Blessing v. Galveston, 42 Tex. 641; State v. Francis, 26 Kan. 724; Miller v. State, 3 Ohio St. 475.)

QUARLES, J.—The controlling question in this case is, Is the act of March 12, 1897, regulating the fees and compensation of county and precinct officers, valid? Section 15, article 3, of· the constitution, is as follows: "No law shall be passed except by bill, nor shall any bill be put upon its final passage until the same, with the amendments thereto, shall have been printed,

for the use of the members: nor shall any bill become a law
unless the same shall have been read on three several days in
each House previous to the final vote thereon; provided, in case
of urgency, two-thirds of the House where such bill may be
pending may, upon a vote of the yeas and nays, dispense with
this provision. On the final passage of all bills they shall be
read at length, section by section, and the vote shall be by yeas
and nays upon each bill separately, and shall be entered upon
the journal; and no bill shall become a law without the concur-
rence of a majority of the members present." It is contended
by the appellant that the provisions of said section of the con-
stitution were not complied with by the legislature in the pas-
sage of said act. The respondent contends that the presumption
is that the legislature complied with all of the provisions of
the constitution, and that the court cannot go back of the en-
rolled bill for the purpose of ascertaining whether the provi-
sions of the constitution were followed or not. Upon this ques-
tion there is some conflict of authority, but the great weight of
authority and the soundest reasoning support the rule that the
court not only may, but it is the imperative duty of the court,
when this issue is before it, to look to the journals of the legis-
lature, and see if, in passing the statute in question, the legisla-
ture have proceeded in the manner provided by the constitution.
By the terms of said section of the constitution, *supra,* six things
must be done in the passage of a law, to wit: (1) The introduc-
tion of the proposed law by bill, necessarily in writing; (2) the
printing of the bill, with the amendments thereto; (3) the
reading of the bill on three several days, in each House, pre-
vious to a final vote thereon; (4) the reading of the bill on its
final passage, section by section; (5) a vote on the final pas-
sage, by yeas and nays; (6) the concurrence of a majority of
the members present. These provisions are mandatory, and it
is the imperative duty of the legislature to obey them. As we
said in the case of *Dunbar v. Board of Commissioners* (de-
cided at the present term), ante, p. 407, 49 Pac. 409, the
duty of supporting the constitution of the state is imposed
upon all public officers by the solemn obligations of the official
oath, which obligations cannot be discharged by disobeying, ig-
noring, and setting at naught the plain provisions of the con-

stitution, but only by obedience thereto. In construing said section of the constitution, it is necessary to inquire into the extent of the application of the *proviso* which we find therein, viz.: "In case of urgency, two-thirds of the House where such bill may be pending may upon a vote of the yeas and nays dispense with this provision." A careful reading of the section shows that that part of the section which precedes the *proviso* consists of three separate clauses disjunctively stated. The first clause relates to the introduction of the bill, the second to the printing of the bill, the third to the reading on three several days. We are of the opinion, from the context, from the conditions which the framers of the constitution thought might arise, and from the apparent object which they had in view, that said *proviso* applies, and was only intended to apply, to the last clause preceding the *proviso*. It was not intended to authorize the legislature to dispense with the introduction of the proposed law by bill, nor was it intended to authorize the legislature to dispense with printing the bill. The framers of the constitution evidently intended by said provision to put it in the hands of the legislature, in case of necessity to act promptly, to pass a bill in one, instead of not less than six, days, and we can imagine a case where such urgency would exist. For instance, an insurrection should take place, and in order to quell it an appropriation should be promptly made, or the executive should be given some power not then given by existing law, or it should be necessary to forthwith enlarge the militia. The object of requiring the printing and three several readings on separate days is a good one. It was to insure the rights and interests of the people against hasty and inconsiderate legislation.

The people, in making and adopting the constitution, were not content with requiring the printing and reading one time only of bills, but have absolutely required that all bills shall be read on three several days in each House; and these several readings cannot be dispensed with, except "in case of urgency, two-thirds of the House where such bill may be pending may upon a vote of the yeas and nays dispense with this provision."

The history of the passage of the act in question, first known as "Senate bill No. 2," afterwards as "Substitute Senate bill

No. 2," as shown by the journals of both Houses, is briefly as follows:

In the Senate: "January 7. Senate bill No. 2, introduced by Senator Thomas A. Davis, read for the first time, and referred to the committee on judiciary. January 11. Judiciary reported, and recommended that the bill be printed. January 20. Bill reported printed. Same day, Senate bill No. 2, by Davis, was read the second time by title and referred to committee on engrossment. January 22. Taken from committee on engrossment, and referred to general calendar for action of the committee of the whole. January 23. Senate bill No. 2 made a special order of business for Monday, January 27, at 2:35 o'clock P. M. January 26. Committee of the whole, having the bill under consideration, reported progress, and further consideration postponed for one week. February 2. The committee of the whole reported progress, and asked leave to sit again. February 8. Consideration by the committee of the whole. The committee reported progress, and recommends that the bill retain its place on the calendar, and asked and was granted leave to sit again. On motion of Senator Joseph C. Rich, Senators Ballentine (of Blaine), Keller, and Davis (of Oneida) were appointed a special conference committee on Senate bill No. 2, and as such to report at 2 o'clock P. M. to-morrow, and the further consideration of the bill postponed until that hour. February 10. Thomas A. Davis of the special conference committee on Senate bill No. 2, informed the Senate that the House had passed a resolution to confer with a like committee from the Senate on said matter, and asked further time, which was granted. February 15, Committee reported, and submitted a substitute for Senate bill No. 2, and recommended the passage of the same. Substitute for Senate bill No. 2, introduced by conference committee: 'An act regulating the fees and compensation of the various county and precinct officers within the state of Idaho.' Read the first time by title, under suspension of section 15, article 3, of the constitution, and Senate rules, by unanimous consent, and referred to committee on public printing. February 17. Substitute for Senate bill No. 2 reported back, printed and placed on the calendar. February 24. The committee of the whole reported progress in consideration of

substitute Senate bill No. 2, and asked and was granted leave
to sit again. On the same day the following report was
adopted by an aye and nay vote of twelve to seven, viz.: 'Mr
President: Your committee of the whole reports that it has
had under consideration substitute for Senate bill No. 2, and
reports same back, with the recommendation that it do pass.'
Substitute for Senate bill No. 2 was filed for second reading,
and considered engrossed. Motion made to reconsider the re-
port of the committee of the whole was laid on the table by an
aye and nay vote of thirteen to seven. Substitute bill No. 2
was considered engrossed, and filed for third reading. Febru-
ary 16. Substitute to Senate bill No. 2 read the third time, and
passed by an aye and nay vote of fifteen to five. March 8. On
motion the Senate concurred in House amendments to substi-
tute Senate bill No. 2, with the exception of the twenty-second
amendment, and the House notified of such concurrence. On
the same day the Senate received a message from the House to
the effect that the House of Representatives had passed substi-
tute to Senate bill No. 2, by conference committee, as amended.
On the same day the bill was reported correctly enrolled, and
signed by the president of the Senate and speaker of the House
and transmitted to the governor."

In the House: "February 2. Message from the Senate that
the Senate had passed substitute to Senate bill No. 2, and that
same was therewith transmitted. March 1. Mr. Keat moved
that the rules of the House, and article 3, section 15, of the con-
stitution, be suspended, and all Senate and House bills, joint
resolutions, and memorials on first and second reading be read
first and second time by title, and referred to their appropri-
ate committees, which motion was adopted by an aye and nay
vote of twenty-four to five; and under the said motion substi-
tute for Senate bill No. 2, by conference committee, 'An act
regulating the fees and compensation of the various county and
precinct officers within the state of Idaho,' was read the first
and second time by title, and referred to committee on county
officers. March 2. The committee on county officers reported
the bill back, and recommended its passage. The bill was then
read a third time, and referred to the judiciary committee.
March 4. The committee on judiciary reported the bill back,

with amendments, and recommended that said amendments be considered *seriatim* by the House, and recommended that the bill, with the amendments thereto, do pass. March 6. Mr. Keat offered two amendments which were adopted. Mr. Rogers offered an amendment which was rejected. Mr. Wright offered two amendments which were rejected. The committee of the whole recommended twenty amendments, numbered from 1 to 20, respectively. The question was then put, 'Shall the bill as amended be passed to third reading?' and which question prevailed. Mr. Rice then offered an amendment which was adopted. Then, on an aye and nay vote, twenty-one to eighteen, the vote to pass the bill to third reading was reconsidered. Mr. Workman moved, as a substitute to amendment No. 13 by committee of the whole, the amendment herein referred to, as an amendment to the amendment by the committee of the whole, being amendment No. 13. The question was then put, 'Shall the substitute motion be adopted?' and carried by an aye and nay vote of twenty-five to ten, and so the substitute motion was adopted. It was then ordered that the bill be passed to third reading. Mr. Elder then moved that the rules of the House and section 15 of article 3 of the constitution be suspended, and Senate bill No. 2 be considered engrossed, read a third time, and placed upon its final passage, which motion was, on an aye and nay vote of twenty-three to three, declared carried. And so the rules and constitution were suspended, and the House passed to the order of third reading of House bills. Senate bill No. 2 by conference committee, 'An act regulating the fees and compensation of the various county and precinct officers within the state of Idaho,' was read a third time. The bill was then put on its final passage, on an aye and nay vote, and carried, the vote being thirty-two to three. March 8. Message received from the Senate as follows: 'Mr. Speaker: I am instructed to inform your honorable body that the Senate has had under consideration and concurred in House amendments to substitute a Senate bill No. 2, with the exception as to the twenty-second amendment, which has been amended as follows: In line 1, after the word "subdivision," strike out the figure "5" and insert the figure "3"; in line 2, strike out the figures "79" and insert the figures "78"—which

is herewith transmitted. Respectfully, Wm. V. Helfrich, Asst. Secretary.' On the same day the committee on printing reported that it had had printed amendments to substitute for Senate bill No. 2, original amendments returned. Workman moved that House concur in the amendment proposed by the Senate as to Senate bill No. 2, in twenty-second amendment; subdivision 5 to be changed to 3, and to be line 78 instead of line 79, which motion prevailed."

And this is the record as it appears in the journals of the two Houses. While many irregularities worthy of criticism appear in this record, we will only call attention to some of the more flagrant violations of the constitution. As shown by the Senate journal, substitute to Senate bill No. 2, offered by the conference committee, which was, in effect and in fact, a new bill, was read the first time by title; the Senate assuming to suspend section 15 of article 3 of the constitution without an aye and nay vote, a thing which cannot be done under the provisions of the constitution. It does not appear from the journal of the Senate that substitute to Senate bill No. 2 was read the second time. The recital that it "was filed for a second reading" does not show that it was read a second time. Each House is required, by section 13, article 3, of the constitution, to keep a journal of its proceedings. This means that the journal shall show all of the proceedings of the House, and all of the steps taken in the passage of every bill. By reason of this provision the journal becomes, not only the best evidence, but the exclusive evidence, of what was done by the House keeping such journal, and courts must impute to the record and statements in the journal absolute verity. The recitals in the journal are conclusive and cannot be contradicted. (*Burkhart v. Reed,* 2 Idaho, 503, 22 Pac. 1; *Clough v. Curtis,* 2 Idaho, 522, 22 Pac. 8; *Wright v. Kelly,* 4 Idaho, 624, 43 Pac. 565; *Water Co. v. Stockslager,* 4 Idaho, 636, 43 Pac. 568; *Blaine Co. v. Heard,* ante, p. 6, 45 Pac. 890.) In the passage of a bill by either House, the journal of such House must show affirmatively that all of the requirements of the constitution were complied with by such House. To suspend the provision in regard to reading all bills on three several days in each House, an urgency must exist; and the suspension must be by an aye and nay vote, and

by two-thirds of the House. It is difficult to see that an urgency could possibly exist in the passage of ordinary measures like the act in question, but, waiving that question, it appears that the Senate assumed to suspend the reading of the bill at length without an aye and nay vote thereon, in absolute violation of the constitution. If either House can disregard one plain provision of the constitution, then it may disregard all of its provisions, and the constitution, instead of being the fundamental law of the land, is a mere sham, an idle mockery, a nullity. In the House of Representatives it does not appear from the journal that the bill was read a first and second time on several days, or that the provision in this regard was suspended. True it is that on the first day of March Mr. Keat introduced in the House an *omnibus* motion suspending section 15, article 3, of the constitution, and dispensing with the reading in full the first and second times of "all Senate and House bills, joint resolutions, and memorials," and permitting the same to be read the first and second time by title only. This provision of the constitution is to be suspended only in case of urgency, and only with reference to a bill which is then pending and before the House for consideration at the time of the suspension. It cannot be suspended generally. It cannot be suspended for one day. If the legislature, or either House thereof, can suspend it for one day, then such House could suspend it for the entire session, and as to all business, and the provision would be an idle toy to be played with and tossed aside at will. The House adopted twenty-two amendments, and it does not appear from the House journal that these amendments were read on three several days. This is required by the constitution. Nor does it appear that these amendments were printed prior to the final passage of the bill by the House, which the constitution absolutely requires. The journal of the Senate fails to show that the bill was read on three separate days in the Senate after it had been amended twenty-two times by the House, or that it was read in the Senate at all after it was amended by the House, or that the bill with the House amendments thereto was ever finally voted on in the Senate after it had passed the House. A bill may originate in and pass one House, and then be sent to the other

House, and be amended in the latter House so as to change the entire purpose of the bill. In such event, if the amended bill is permitted to become a law without having been read or passed by the other House, it would be a violation of the constitution. It was the intention of the framers of the constitution to require amendments that might be adopted to a pending bill to be read three times on several days, the same as original bills, or sections of the pending bill which is amended. In the case at bar, speaking from the journal of the Senate, the bill in question, which passed the House after being materially changed, was never read in the Senate or put to a vote on final passage in the Senate. A bill which passes one House, and is materially changed by amendment by the other House, and then sent back to the House where it first originated, must go through the same procedure as to reading and final vote as if it was an original bill. The reason for this rule is obvious. In the case at bar, substitute to Senate bill No. 2, after it was amended in twenty-two instances, was not the bill which the Senate passed and sent to the House, and must, under the constitution, when returned to the Senate, be treated (at least, so far as the amendments are concerned) by the Senate as if it originated in the House. The mere declaration by the Senate that "we concur in the House amendments" does not answer the requirements of the constitution.

The plaintiff, in preparing his case, procured a transcript of the journals of both Houses, certified by the Secretary of State to be full and correct. This is the correct practice, and we commend it.

The court should treat the enrolled bill (the fact that it is regularly enrolled) as presumptive evidence that the legislature, in passing it, performed all of its duties; but this presumption is subject to rebuttal. And when the validity of a statute is attacked the party attacking should show by the journals that at least one requirement of the constitution was disregarded, and the failure of the journals to show that any constitutional requirement was obeyed is conclusive evidence that such requirement was not obeyed. If all the requirements of the constitution had been complied with, as to reading, printing and voting on final passage, in regard to the bill in question, by

both Houses, then those portions of the act in question which relate to state officials are void, for the reason that such matter is not embraced in the title to said act, as required by section 16, article 3, of the constitution. We only refer to this for the reason that it tends to show how lightly the legislature treated the provisions of the constitution in passing the act in question. The object of the act in question, which was to cut down the excessive cost of litigation, and correct abuses in the regulation of fees of county and precinct officers, is a good one, and one with which this court is in full sympathy. It is therefore with great reluctance that we hold the act in question to be void, but there is no other alternative.

The conclusions reached, after a careful and full consideration, are: 1. To determine the validity of a statute, the court can and should, in the proper case, go back of the enrolled bill to the journals of both Houses, to ascertain whether the requirements of the constitution were complied with by the legislature in enacting such statute. 2. The act in question is void *in toto,* by reason of the failure of the journals of the legislature to show a compliance with the requirements of the constitution in passing said act. The judgment appealed from is reversed, and the cause remanded, with instructions to the trial court to enter judgment in favor of the defendant. Costs of appeal awarded to the appellant.

Sullivan, C. J., and Huston, J., concur.

## ON REHEARING.

HUSTON J.—The learned attorney general, on behalf of the respondent, has filed a voluminous petition for rehearing, which we have carefully considered. A perusal of the same shows that the acquaintance of the attorney general with the arguments of appellant, printed and oral, is as limited as is his knowledge of the decision heretofore rendered in this case. In the petition he says: "No reference is made in the opinion of the court herein to said section 13 [article 3], and we are of the opinion that the court, in deciding said case, overlooked said section." An inspection of the opinion will show that we did refer to section 13, article 3, of the constitution; and for

the benefit of the learned attorney general, whose knowledge of the said opinion seems to have been derived from newspaper articles and street-corner talks, we will here repeat what we said in the original opinion in regard to said section, to wit: "Each House is required, by section 13, article 3, of the constitution, to keep a journal of its proceedings. This means that the journal shall show all of the proceedings of the House, and all of the steps taken in the passage of every bill. By reason of this provision the journal becomes, not only the best evidence but the exclusive evidence of what was done by the House keeping such journal, and courts must impute to the record and statements in the journal absolute verity." We will add to what was said before that said section requires each House to keep a full, not a partial, record of its proceedings. If, in the face of this provision, the legislature can omit from its journals parts of its proceedings, it may omit other parts of its proceedings without limit, and the section would be almost, if not wholly, ineffectual. The authorities cited to establish the rule that mere silence of the journal to show that a certain thing was done does not prove that it was not done, we apprehend, arose under constitutions in many respects unlike ours. An examination of many of the authorities cited by the respondent to support this contention seems to limit the rule to those acts which the constitution does not require to appear in the journal. But our constitution clearly intends that all of the proceedings of each House shall appear in the journal. Hence we must presume that everything done by each House, all of its proceedings, and nothing else, appear in the journal. In fact, the legislature seems to have taken this view, and has caused the minute details of its proceedings to be recorded in its journals.

Again, the attorney general is in error when he says in the petition for rehearing, at page 5, that "appellant has never contended that the journals do not show that yea and nay vote was taken upon the final passage of the bill." We respectfully refer the attorney general, and all other persons who entertain erroneous ideas of the court's rulings and what was argued before the court, to page 9 of appellant's brief, where the following language is found, to wit: "Calling the court's attention

to the final passage of this act through the Senate, we find
the following journal entry in regard thereto (page 12, folio
35, of the transcript) : 'Motion.   Senator J. C. Rich moved to
concur in the House amendment to substitute Senate bill No.
2, with the exception of the twenty-second amendment.   Car-
ried, and the House was notified.'   Appellant contends that, as
this was the final passage of the act through the Senate, it was
a violation of, and did not comply with, the requirements of
the constitution as to such final passage, as there was no vote
taken by ayes and nays, which the constitution requires to be
done."   So the record does show that the appellant argued and
contended that the Senate never passed the act in question:
this contention being necessarily based upon the idea that the
bill which the Senate first passed was materially changed by
the House, and after being so changed was not read or passed
on an aye and nay vote in the Senate.

It is a matter of regret that the attorney general of the state
should ridicule any of the provisions of the constitution, or
speak of them as "insignificant," or use this language, which
we find in the petition for rehearing: "We admit that the con-
stitution of the state is surrounded with a halo of sanctity and
solemnity, a great part of which is fictitious."   The constitu-
tion requires certain things to be done in connection with the
passage of any and all laws.   It is true that the doing of these
things is a matter of procedure.   But by what right shall anyone
be permitted to say that any of the things required by the con-
stitution to be done are "insignificant," and may therefore be
omitted?   Has anyone more right to say that one of the things
required by the constitution is insignificant and may be omit-
ted than he has to say that any other thing required is insig-
nificant and may therefore be omitted?   If the right to ignore
one provision exists, the right to ignore all exists.   If the court
must wink at one violation of the constitution, it must wink
at other violations of it.   If the court must approve one viola-
tion of the constitution, it must, to be consistent, approve other
violations of it.   We must be subject to the constitution, or else
subject to the whims of those individuals who treat the sanctity
of the constitution as fictitious and its provisions as insignifi-
cant.   We cannot serve both God and Mammon.   We must

'travel either the one road or the other. We think that safety and security demand that we stick to the letter and spirit of the constitution, that we obey all of its mandates, until the people, the source of all power, who made it, change its provisions. Let us obey the constitution in all of its requirements, and treat all of its provisions as important.

Mr. Sutherland, in his work on Statutory Construction, speaking of another provision, at section 79, says: "The efficiency of this constitutional remedy to cure the evil and mischief which has been pointed out depends on judicial enforcement; on this constitutional injunction being regarded as mandatory, and compliance with it essential to the validity of legislation. The mischief existed notwithstanding the sworn obligation of legislators. It might be expected to continue, notwithstanding that obligation is formulated and emphasized in this constitutional injunction, if it be construed as addressed exclusively to them, and only directory. It would, in a general sense, be a dangerous doctrine to announce that any of the provisions of the constitution may be obeyed or disregarded at the mere will or pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of that instrument. It would seem to be a lowering of the proper dignity of the fundamental law to say that it descends to prescribing rules of order in unessential matters, which may be followed or disregarded at pleasure. The fact is this: that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the legislature as if it was devoid of moral obligation, and to be therefore habitually disregarded." Mr. Black, in his work on Interpretation of Laws, at section 13, quotes from the above section of Mr. Sutherland's work with approval, and adds: "As a rule, therefore, whenever the language used in a constitution is prohibitory it is to be understood as intended to be a positive and unequivocal negation." Judge Cooley, in his work on Constitutional Limitations, fifth edition, page 93, says: "But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of the constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are

looked upon as essential to the thing to be done, and they must be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end, especially when, as has already been said, it is but fair to presume that the people, in their constitution, have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication." Continuing, Judge Cooley says (page 94) : "There are some cases, however, where the doctrine of directory statutes has been applied to constitutional provisions; but they are so plainly at variance with the weight of authority upon the precise points considered that we feel warranted in saying that the judicial decisions as they now stand do not sanction the application." And at page 156 he further says: "It is a necessary attribute of sovereignty that the expressed will of the sovereign is law; and while we may question and cross-question the words employed, to make certain of the real meaning, and may hesitate and doubt concerning it, yet when the intent is made out it must govern, and it is idle to talk of forms that should have surrounded the

expression, but do not. But when the legislative power of a state is to be exercised by a department composed of two branches, or, as in most of the American states, of three branches, and these branches have their several duties marked out and prescribed by the law to which they owe their origin, and which provides for the exercise of their powers in certain modes and under certain forms, there are other questions to arise than those of the mere intent of the law-makers, and sometimes forms become of the least importance. For in such case not only is it important that the will of the law-makers be clearly expressed, but it is also essential that it be expressed in due form of law, since nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential." Mr. Black, in his work on Constitutional Law, at page 336, says: "The constitutions of many of the states require that a bill, before it shall become law, shall be read a certain number of times (usually two or three) in each House. In respect to the manner of such reading the provision is considered merely. directory, but not so with regard to the fact of its being read. If the constitution is not obeyed in this latter particular the statute is void." In harmony with the above views, with which we are in full accord, we are compelled to hold that the provisions of our constitution limit the power of the legislature in the enactment of laws to the mode therein prescribed.

The persistent contention of the respondent that the court should not go back of the enrolled bill to the legislative journals to see if the act in question was passed in the mode required by the constitution in face of the fact that this court has repeatedly held that it may do so, is ill-advised and not worthy of consideration. To hold in accordance with this contention of respondent would make the provisions of the constitution merely directory and subject to the whims of either House of the legislature, contrary to the expressed will of the people. That the court may go to the journals of the legislature to see if the provisions of the constitution were obeyed by the legislature in the enactment of a law had become the established doctrine of

this state before the convening of the last session of our legis-
lature, and the legislature was fully aware of this settled rule
when it attempted to pass the act in question.   The rules of con-
struction applicable to statutes and constitutional provisions
should be permanent and unchangeable.   On this point Judge
Cooley, in his work cited, *supra,* at page 67, says: "A cardinal
rule in dealing with written instruments is that they are to re-
ceive an unvarying interpretation, and that their practical con-
struction is to be uniform.   A constitution is not to be made
to mean one thing at one time and another at some subsequent
time, when the circumstances may have so changed as perhaps
to make a different rule in the case seem desirable.   A prin-
cipal share of the benefit expected from written constitutions
would be lost if the rules they establish were so flexible as to
bend to circumstances or be modified by public opinion.   It is
with special reference to the varying modes of public opinion,
and with a view to putting the fundamentals of government
beyond their control, that these instruments are framed, and
there can be no such steady and imperceptible change in their
rules as inheres in the principles of the common law.   Those
beneficent maxims of the common law which guard person and
property have grown and expanded until they mean vastly more
to us than they did to our ancestors, and are more minute, par-
ticular, and pervading in their protection; and we may con-
fidently look forward in the future to still further modifica-
tions in the direction of improvement.   Public sentiment and
action effect such changes, and the courts recognize them; but
a court or legislature which should allow a change in public
sentiment to influence it in giving to a written constitution
a construction not warranted by the intention of its founders
would be justly chargeable with reckless disregard of official
oath and public duty, and, if its course could become a prece-
dent, these instruments would be of little avail.   The violence
of public passion is quite as likely to be in the direction of
oppression as in any other; and the necessity for bills of rights
in our fundamental laws lies mainly in the danger that the
legislature will be influenced, by temporary excitements and
passions among the people, to adopt oppressive enactments.
What a court is to do, therefore, is to declare the law as writ-

ten, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

There is no intention disclosed in the constitution to make the legislature the exclusive judges of the constitutionality of its acts. The legislature must, in the very nature of things, use its judgment, in the first instance, as to whether a proposed action by it is constitutional or not, or whether it is acting in the manner required by the constitution. But whether the legislature should make an honest mistake, or perversely violate the constitution, the remedy for such violation exists, nevertheless, and courts must refuse to aid and abet such violations of the constitution. The court does this by refusing to recognize the validity of any act passed in violation of the mandates of the constitution.

The learned counsel for respondent (the attorney general) cites the provisions of section 9, article 3, of our constitution, to the effect that each House shall "determine its own rules and proceedings," etc. We are somewhat at a loss to understand the pertinency of this quotation in the consideration of the questions involved. Does the learned attorney general desire to be understood as claiming that this is a controlling provision of the constitution, and is to be taken literally, without regard to the provision of section 15, article 3? This would be a strange and unheard-of rule of construction, but without it the quotation of counsel is idle.

In preparing his petition for rehearing the learned attorney general says: "Nor have they [counsel for appellant] ever claimed that the journals affirmatively show that the other requirements of the constitution relating to the passage of the bill were not complied with." This proposition is on a par with that other proposition so often reiterated, that this court, in its opinion in this case, assumed to be the judge as to whether an "urgency," as provided in section 15 of article 3, existed. Is it carelessness or fatuity which causes such an entire misstatement of fact as well as conclusion? What the court did say, in effect, was this: That as the constitution authorized the suspension by the legislature of the provisions of section 15;

article 3, of the constitution, with reference to the reading of bills on three several days, only when an urgency requiring such suspension existed, the fact of such urgency must appear upon the record; otherwise the whole purpose and intention of the provision would be defeated. To sum up this whole matter in one sentence: What this court has held is this: Where the mandatory provisions of the constitution require certain things to be done by the legislature in the enactment of laws, the court will hold that where a law has been passed without a compliance with such mandatory constitutional provisions, the same is unconstitutional. Against this conclusion, as a legal proposition, we have not, nor shall we ever be, cited to a single authority or principle predicated upon principles upon which our government is founded.

We cannot better answer the oft-reiterated claim, not argument, against the decision in this case, that it assumes that the amendments to a bill must be subjected to the same constitutional rules as the original bill, than by quoting from some of the very numerous authorities cited by the learned attorney general in his petition for a rehearing, as illustrative of the utter inutility of the rule contended for by him. We cite from Cooley's Constitutional Limitations, fifth edition, page 167, note 3: "A practice has sprung up of evading these constitutional provisions by introducing a new bill, after the time has expired when it may constitutionally be done, as an amendment to some pending bill, the whole of which, except the enacting clause, is struck out to make way for it. Thus, the member who thinks he may possibly have occasion for the introduction of a new bill after the constitutional period has expired takes care to introduce sham bills in due season, which he can use as stocks to graft upon, and which he uses irrespective of their character or contents. The sham bill is perhaps a bill to incorporate the city of Siam. One of the member's constituents applies to him for legislative permission to construct a dam across the Wild Cat river. Forthwith, by amendment, the bill entitled a bill to incorporate the city of Siam has all after the enacting clause stricken out, and it is made to provide, as its sole object, that John Doe may construct a dam across the Wild Cat. With this title and in this form it is passed, but

the House then considerably amends the title to correspond with the purpose of the bill, and the law is passed, and the constitution at the same time saved. This trick is so transparent, and so clearly in violation of the constitution, and the evidence at the same time is so fully spread upon the record, that it is a matter of surprise to find it so often resorted to." In the case of *People v. Starne,* 35 Ill. 121, 85 Am. Dec. 348, and note, it is said the courts should not enforce a legislative act unless there is record evidence from the journals of the two Houses that every material requirement of the constitution has been satisfied. In the case of *Miller v. State,* 3 Ohio St. 475, much relied upon by respondent, we find that the constitutional provision was as follows: "Every bill shall be fully and distinctly read on three different days, unless, in case of urgency, three-fourths of the House in which it shall be pending shall dispense with the rule." The court held that as the record did show that the bill had been read a third time, although omitting to show that it had been read "fully and distinctly," there was a sufficient compliance with the constitutional provision. In commenting upon this case, Judge Cooley says (Cooley's Constitutional Limitations, 5th ed., 168, note 1) : "The distinctness with which any bill must be read cannot possibly be defined by any law; and it must always, from the necessity of the case, rest with the House to determine finally whether in this particular the constitution has been complied with or not. But the rule respecting three several readings on different days is specific, and capable of being precisely complied with; and we do not see how, even under the rules applied to statutes, it can be regarded as directory merely, provided it has a purpose beyond the mere regular and orderly transaction of business. That it has such a purpose, that it is designed to prevent hasty and improvident legislation, and is therefore not a mere rule of order, but one of protection to the public interest and to the citizens at large, is very clear; and, independent of the question whether definite constitutional principles can be dispensed with in any case on the ground of their being merely directory, we cannot see how this can be treated as anything but mandatory."

The respondent seriously attacks that part of the decision in this case which holds that amendments to a pending bill must be read on three several days, in each House, unless in case of urgency the three readings on several days be dispensed with by two-thirds of the House on an aye and nay vote. That this rule is correct, and in harmony with the letter and spirit of our constitution, we are fully convinced. A "bill," within the contemplation of the constitution, means a draft of a proposed law, and nothing else. After a bill has been introduced in one House, and an amendment which changes one or more of its original features or adds new features is adopted by such House, the amendment then enters into and becomes a part of the bill or draft of the proposed law, and is as much a part of the bill as if it had been incorporated in the draft of the proposed law before it was introduced into such House. The constitution provides (article 3, section 15) that "no law shall be passed except by bill," and further says: "Nor shall any bill become a law unless the same shall have been read on three several days in each House previous to the final vote thereon." (Const., art. 3, sec. 15.) The term as here used is generic, and means not only the draft of the proposed law as originally introduced, but such draft with all of the graftings which may be made thereon. In other words, it means the full draft of the law which the legislature passes. It is argued that the procedure prescribed by the constitution is burdensome, and will seriously impede legislation. If we admit this to be true, the answer is that the remedy is in a change of the constitution, not in violations of its mandates. The court did not make, nor can it change, the provisions of the constitution. We are asked to give our assent to the act in question, and pronounce it valid, when it was unquestionably passed, not in the manner required, but in a manner forbidden by the constitution. We cannot do so, and should we do so, it would be an attempt on the part of one branch of the government to modify the provisions of the constitution, and usurp a power which belongs to, and can only be exercised by, the people in their sovereign capacity. The object of these provisions are twofold: 1. To insure against hasty and inconsiderate legislation, by giving the opportunity to each member of the legislature to familiarize

himself with all of the provisions of every proposed law, and afford sufficient time for reflection as to the effect and consequences of the enactment of any proposed law; 2. To give the people the opportunity of learning what is being done or proposed to be done by their legislature, thus affording them opportunity to remonstrate against the passage of any proposed law which they might regard as detrimental or obnoxious. These objects are thwarted and wholly defeated if amendments are not treated as parts of the bill, and read three times on several days, and read section by section on final passage, and then passed by an aye and nay vote. If, under the guise of an amendment, a proposed law which has never been read in both Houses is permitted to have the sanctity of law, the provisions of the constitution amount to nothing, and the will of the people may be ignored, and the object of the provisions entirely defeated. More than this, the floodgates of fraud would be thrown wide open, as to the enactment of laws, and the people be without remedy. To show how easily this could be done, just suppose that one senator and one representative desire to pass a certain measure which they know will be obnoxious to the people; that, by agreement, they should draft a bill which is entirely different in intent and effect from the one which they desire passed; that it is introduced into the Senate, and perchance known as "Senate bill No. 2," where it is read on three several days, and properly passed on an aye and nay vote; that it is then sent to the other House, where it is read on three several days, when the member who is in collusion with the senator who introduced it in the Senate offers his amendment, which the House adopts, and which changes the entire object, scope, and effect of the proposed law, and which, although relating to the same subject and the same title, is in fact a new and different bill from the one introduced in the Senate; that this new bill, called an "amendment," is then printed and passed by the House without being read but one time; that the House then sends a message to the Senate, saying that "the House has passed Senate bill No. 2 as amended"; and that thereupon a senator "moves that the Senate concur in the House amendments to Senate bill No. 2," which motion should be declared passed without the amendment having been read or

voted on by an aye and nay vote in the Senate. Would not this be "whipping the devil around the stump," and doing indirectly what the constitution directly forbids? Yet this was done in the case at bar, in violation of all established law, and in contravention of the provisions of the constitution.

In this connection, and in approval of what is therein said, we will quote extensively from the decision of the Kentucky court of appeals in *Norman v. Board of Managers,* 93 Ky. 537, 20 S. W. 901, as follows: "Section 46 of our constitution provides: 'No bill shall become a law unless, on its final passage, it receives the votes of at least two-fifths of the members elected to each House, and a majority of the members voting, the vote to be taken by yeas and nays and entered in the journal; provided, any act or resolution for the appropriation of money, or the creation of debt, shall, on its final passage, receive the votes of a majority of all the members elected to each House.' The act originated in the Senate, and passed that body upon a yea and nay vote, entered upon its journal, by the required majority. It then went to the other House, where, after being amended, it passed upon a like vote, entered upon its journal, by a like majority. It then came back to the Senate, where the amendments were concurred in without a yea and nay vote, and without the vote of a majority of the members elected. It is conceded by the counsel for the appellees, and seems plain, that this mode of proceeding did not conform to the constitution. It complied with it in neither letter nor spirit. The object of the section above cited was to have the assent of a majority of all of the members elected to each House to all the provisions of the act, and that this should appear by yea and nay vote entered upon its journal. If a bill, after passing one House in the proper manner, and then, after amendment, passing the other House in like manner, could come back to the House in which it originated, and be adopted by a majority of those voting, or a quorum, it would defeat this object and render the section ineffectual. Let us look at it practically. An appropriation bill of $100 originates in the Senate, and is properly passed. It goes to the House, where it is amended by making the sum $10,000, and is then properly passed by it. It returns to the Senate for concurrence, and is adopted as

amended, by a majority of those present, without a yea and nay vote. Can it be well contended that this would be a compliance with the constitution? If so, then, there being thirty-eight senators, it would require twenty, or a majority of them, to pass a bill for a trifle, but after being amended in the House so as to, perhaps, bankrupt the treasury, it could be concurred in by the Senate by the votes of eleven members, or a majority of a quorum; and in case of the House, with its one hundred members, it would require fifty-one to pass the bill if it originated there, but only twenty-six, or a majority of a quorum, to concur in it after it had been changed in like manner by the Senate. Further illustration seems needless. It is true it has been held that the final passage of a bill means when it first passes the body, and not when it returns to it, after amendment, for adoption; and it is said that the constitutional provision as to the number of votes, and the entry of the yea and nay vote on the journal, does not apply to amendments or the reports of conference committees. If so, then, no matter how material the change, a majority vote of a quorum may pass the bill. The words 'final passage,' as used in our constitution, mean final passage. They do not mean some passage before the final one, but the last one. They do not mean the passage of a part of a bill, or what is first introduced, and which may by reason of amendment become the least important. If so, then the body may pass what is practically a new bill in a manner counter to both the letter and spirit of the constitution. When the bill was voted on in the Senate as amended, and after its return from the House, there never was any further action by the Senate. It was the final vote, and therefore its final passage; and, being so, a majority vote of all the members elected, with an entry by a yea and nay vote upon the journal, was necessary to its constitutional enactment. The bill, as approved by the speakers of the two Houses and the governor, never was passed by the Senate by a majority of all of its members, nor by a yea and nay vote. It is said, however, upon the one side, that having been enrolled, signed by the presiding officer of each House, and approved by the governor, the act must be conclusively presumed to have been constitutionally enacted; that public policy requires this rule, else con-

fusion will result, by our statute law being reduced from a state of certainty to one of doubt. Upon the other side it is urged, with equal ability, that a *prima facie* case only is thereby presented, and that resort may be had to the journals of the legislature, which are required by the constitution to be kept, and are kept, under the supervision of all the members, as to the truth of the matter. Each position is supported by numerous authorities, and, whether the one rule or the other obtains, more or less abuse and danger may result. There is some dynamite either way, but perhaps not as much in the latter as some apprehend, as the party questioning the enrolled and approved act must at the outset overcome a *prima facie* case. The first view is the English one, where there is no written constitution. It has been followed by our supreme court (United States), and by at least nine of the supreme courts of the states. The weight of authority in this country, as declared in perhaps as many as nineteen states, is, however, the other way."

Since the rendition of the opinion *supra* the court of appeals of Kentucky have held, in *Lafferty v. Huffman*, 99 Ky. 80, 35 S. W. 125, that a bill which has been properly enrolled, signed by the presiding officer of each House, and approved by the governor cannot be impeached by reference to the journals of either House to show the mode of its enactment. The latter decision was followed by the same court in two later cases, *Commissioner v. Shelton*, 99 Ky. 120, 35 S. W. 128, and *Commissioner v. Hardin Co. Court*, 99 Ky. 188, 35 S. W. 275. Whether this change in the opinion of that eminent court was caused through fear of appearing guilty of indelicacy and disrespect toward a co-ordinate branch of government, or through fear that the rules enunciated in *Norman v. Board of Managers* would entail upon the court considerable labor which otherwise would not devolve upon it, or other grave reason, we are at a loss to determine. But the doctrine announced in *Lafferty v. Huffman* simply places it in the power of the legislature to violate the provisions of the Kentucky constitution in regard to the passage of bills. Look at it practically, taking our illustration from the decision in *Norman v. Board of Managers, supra.* A bill originates in the Senate, appropriating

$100, and properly passes the Senate. It then goes to the House, where it is amended by making the sum $10,000, and is then properly passed by the House. It then returns to the Senate for concurrence, and is adopted by the Senate without the yea and nay vote required by the constitution, and by a majority vote of those present, but less than a majority of all the members elected to the Senate. By the Kentucky constitution this appropriation bill could not be law, for the reason that it did not receive a majority of the votes of all the members elected to the Senate, voting by ayes and nays entered on the journal. The language of the Kentucky constitution is prohibitory—"No bill shall become a law unless," etc., and, in the language of Mr. Black, "is to be understood as intended to be a positive and unequivocal negation." The bill is pronounced by the constitution to be "no law," yet the court, by adopting the convenient rule that it will not go back of the enrolled bill, but presume, from the fact that the bill was signed by the presiding officers of both Houses and approved by the governor, that all of the requirements of the constitution relating to the passage of bills were complied with by the legislature, substituting fiction for fact, and recognizing said act as valid, simply nullifies the provisions of the constitution relating to the passage of bills. More than that; the court pronounces that to be law which the constitution says is not, and shall not be law; thus making that which is void valid, and infusing life into that which never before had life. In such case it would be pertinent to inquire who made the act appropriating this $10,000. The legislature did not, because a majority of all members elected to the Senate did not assent thereto on an aye and nay vote, for which reason the constitution declares it shall not be law. But the court, by recognizing it as law, gives it the effect and force of law. This, in our opinion, encroaches upon the constitutional rights which the people have reserved, and invades the realm of the law-making branch of the government. It is not the province of the court to make law. But when a court, in effect, nullifies provisions in a constitution, and recognizes statutes which are declared to be void by the constitution as valid, it is simply making law. That eminent patriot and statesman, Thomas Jefferson,

entertained grave fears lest the republic should be undermined and destroyed by encroachments on the part of the courts upon the constitutional rights of the people. Neither branch of government must encroach upon the constitutional rights of the people. The people of this state have reserved to themselves the constitutional right to have all of their laws made in a certain mode, and have withheld from the legislature the power to make laws in any other mode. Shall the legislature and the judiciary connive together to overthrow this constitutional right? Do the obligations of the official oath rest so lightly upon judicial officers that they may obey those obligations or not, support the constitution or not, as they may deem expedient or inexpedient? May they enforce the fundamental law or refuse to do so at pleasure? If so, then constitutional government is in the last stages of dissolution, and the people have no constitutional rights which must necessarily be respected.

Respondent, in the petition for rehearing, says: "Can it be said that section 15 of article 3 of our constitution requires each amendment to a bill to be printed, or to be read on three several days? If such is the intent and purpose of the constitution, one member in either House can obstruct all legislation by simply offering amendments thereto. If all amendments, however numerous, are required to be printed, and read on three several days after printing, it would cause untold delay." To this we answer: The offering of an amendment or proposition to change a bill is not an amendment, and does not become such until the House in which it is offered accepts or adopts it. Then, under the express commands of the constitution, an amendment which has been offered and accepted, and thus enters into and becomes a part of the bill, must be printed, and the whole bill, not a part of it, must be read on three several days, unless, owing to the existence of an urgency, the three readings on several days be dispensed with by two-thirds of the House on an aye and nay vote entered in the journal. The presumption is that no member of either House will offer amendments merely for the purpose of delay. And if an amendment is offered to a meritorious bill which is pending in either House, merely for delay, the House

presumably will reject it, or should do so. But, if an amend-
ment is offered which possesses merit, then the House in which
it is offered should, in the interests of the people, and acting in
the line of official duty, accept it, have it printed, and give it
that mature and deliberate consideration which the constitu-
tion clearly intended should be given to all bills and to all
parts of every bill. The position of respondent is absurd, and
the argument advanced in this particular is without merit.

Respondent contends that it is not necessary for the jour-
nals to show anything except what the constitution expressly
says must be entered upon the journals. This would dispense
entirely with the office of the journal, and limit the entries
therein to a record of the vote upon the expulsion of a mem-
ber and on final passage of bills. The idea is not in accord
with the spirit, and is opposed to the letter, of our constitution.

Respondent also contends that, except as to the entry of the
vote on final passage and the vote on expulsion of a member,
it is unnecessary to enter any vote in the journal unless de-
manded by three members under section 13, article 3, of the
constitution. It is the settled rule in nearly all of the courts
that when an aye and nay vote is required by the constitution
an entry of such vote must appear in the journal. Our consti-
tution says that the reading on those several days cannot be dis-
pensed with unless two-thirds of the House, "voting by yeas
and nays," should, in case of urgency, dispense with this pro-
vision. This means that such vote shall be entered on the
journal. Under section 13, three members, when they desire
it, may have the vote on any motion, committee report, or any
other question taken by yeas and nays, and entered in the
journal. But the vote on final passage of any bill, or on a
suspension of the provision which requires the reading of bills
on three several days, or on the expulsion of a member, must,
whether demanded by three members or not, be by yeas and
nays, and entered in the journal.

Respondent contends that some reliance and confidence
must be bestowed upon the proceedings of the legislature.
This is true, and clearly intended by our constitution. The
legislature is required to keep a record of its proceedings.
Courts must rely upon that record, and presume it to be ab-

solutely correct, and refuse to permit it to be contradicted. The constitution points out the mode in which all laws shall be passed, and requires the legislature to furnish through its journals the evidence showing the mode in which it passed every bill. By the evidence thus furnished by the legislature it must affirmatively appear that any act, when questioned, was passed by the legislature in that mode only authorized by the constitution. The object of the journals, principally, is to enable the people to ascertain that any and all laws were enacted in the manner required by the constitution, so as to determine whether such was constitutionally passed, and therefore valid and binding. If we refuse to go back of the enrolled bill—close our eyes and ears to the evidence which the legislature furnishes, and is required by the constitution to furnish—the object of these constitutional provisions may be wholly defeated.

It has been said that the decision in this case abrogates the principle of majority rule. Does it? The people adopted the constitution, and have expressed in it the will of the majority as to the manner in which laws shall be enacted. Shall forty-nine members or any part thereof, in one House, or twenty-one members, or any portion thereof, in the other House, be permitted to enact a law in any other manner? If so, the will of the people is set at naught, and the will of a small number of individuals substituted for the will of the great majority. The creature must not be regarded as greater than the creator. Each of the three co-ordinate branches of our government is the creature of the constitution, subject and necessarily subordinate, thereto. In construing constitutional provisions, certain fixed and absolute rules, which the court cannot disregard, must be observed, viz.: The words of the instrument are to control. The intent of the people in adopting it is to govern. The intent of the people is to be found in the words used. The whole instrument must be examined. Words are not to be regarded as used without occasion. The words used are to be considered with reference to their usual signification. Effect must be given to the whole instrument, etc. It is needless to use further illustrations or cite additional authorities. After another full and careful consideration of this case in

all its bearings, I see no reason for changing our views concerning the questions involved. A rehearing is denied.

SULLIVAN, C. J., Dissenting.—I think the original opinion in this case should be modified upon two points, at least: 1. Wherein it holds that the journals must affirmatively show that each and every requirement of the constitution has been complied with in the passage of a bill; 2. Wherein it holds that the constitutional provisions require bills to be read on three several days in each House before the final vote thereon.

As to the first point: Section 13, article 3, of the constitution of this state is as follows: "Each House shall keep a journal of its proceedings; and the yeas and nays of the members of either House on any question shall at the request of any three members present be entered on the journal." In the opinion it is held that the meaning of the first clause of said section is that the journal must show all of the proceedings of the House and all of the steps taken in the passage of a bill. While that may be true, I do not think the silence of the journal as to some of the proceedings required by the constitution to pass a bill should be held conclusive evidence, or any evidence, to show that such bill was not regularly passed. The last clause of said section refers to and commands the entry on the journal of the yeas and nays on any question when requested by three members. Voting is a proceeding required in the passage of motions, resolutions, etc. And, if it was intended by the framers of the constitution that the first clause of said section was mandatory as to every act and proceeding of either House, what was the necessity for the last clause of said section? If the first clause absolutely required the entry on the journals of the yeas and nays whenever a vote was so taken, the last clause of said section adds nothing thereto, and was a work of supererogation. I am of the opinion that it was not intended by the first clause of said section to have all laws held invalid where the journals failed to show that each and every step required by the constitution in the passage of a bill had not been taken. Said section clearly intimates, to my mind, that in the passage of motions, resolutions, etc., when a yea and nay vote is taken, it need not be entered on the journal, unless requested by three members, although said section

requires each House to keep a record of its proceedings. Section 15 of said article 3 provides, among other things, that on the final passage of a bill the vote shall be by yeas and nays, and entered upon the journal. Why provide in said section 15 that such yea and nay vote shall be entered on the journal, if such act was commanded by the first clause of section 13 of said article 3? Thus it is shown that the framers of the constitution, after directing each House to keep a journal of its proceedings, expressly and specifically commands that the yea and nay vote on any question must be entered on the journal on the request of three members, and also commands that on the final passage of any bill the vote must be by yeas and nays, and entered on the journal. I find no provision in the constitution that expressly requires either House to enter on its journal the fact that a bill was printed, or that it was read on three several days, before being placed on its final passage. The rule for which I contend has obtained in the state of Illinois, and many other states of this Union, for many years, and not a single instance has been called to my attention where a legislature has resorted to the means suggested by my associates in the enactment of laws in violation of said provisions of the constitution.

In *Miller v. State,* 3 Ohio, St. 475, Chief Justice Thurman, speaking for the court, said: "Thus we have, *inter alia,* the provisions before quoted, 'that every bill shall be fully and distinctly read on three different days, unless, in case of urgency, three-fourths of the House in which it shall be pending shall dispense with this rule.' This is an important provision, without doubt, but nevertheless there is much reason for saying that it is merely directory in its character, and that its observance by the assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts. Any other construction, we incline to think, would lead to very absurd and alarming consequences." It is said by Mr. Sutherland in his work on Statutory Construction (page 48): "Journals are records, and, in all respects touching proceedings under the mandatory provisions of the constitution, will be effectual to impeach and avoid the acts recorded

as law and duly authenticated, if the journals affirmatively show that these provisions have been disregarded. In the absence of such an affirmative showing, and even in cases of doubt, it will be presumed that a quorum was present; that the necessary readings occurred; that amendments made by one branch, though extensive, were germane; that they were concurred in by the other branch—though the journals may be silent." Touching the question under consideration, it is stated in Black on Constitutional Law (page 297) as follows: "But if the journal entries are ambiguous, or if they fail to show facts which the constitution does not expressly require them to show, this will not raise any presumption against the validity of the action of the legislature. On the contrary, the courts will presume that the legislature fully complied with the constitutional requirements, although the journals do not show the fact." In *State v. Illinois Cent. R. Co.,* 33 Fed. 730, under constitutional provisions like our own in regard to reading a bill upon three different days, it is held that the failure of the journal of the Senate to show compliance therewith will not invalidate the bill or act. The case is from the United States circiut court in and for the northern district of Illinois, and the opinion is by Mr. Justice Harlan, of the supreme court of the United States, who presides in the seventh circuit, In that case it was contended that the general assembly, in passing the act under consideration in that case, did not meet the requirements of the constitution, in that the journals fail to show that the bill was read on three different days in each House. Nothing appeared in the Senate journal to show that the bill had been read a second time in that body, and, after stating the facts, Mr. Justice Harlan states that the question for determination was, "Is it essential to its [the bill's] validity that it should appear in the journal that the bill was read on three different days in each House? Does the mere silence of the Senate journal as to whether the bill was in fact read a second time in that body on some one of the three different days raise a conclusive presumption that it was not so read?" The learned justice then calls attention to the fact that counsel, to support the proposition that the mere silence of the journal as to whether a bill was read on three different days was fatal

to the validity of the act, cites *Spangler v. Jacoby*, 14 Ill. 297, 58 Am. Dec. 571, and note, in which that court said: "In our opinion, it is clearly competent to show from the journals of either branch of the legislature that a particular act was not passed in the mode prescribed by the constitution, and thus defeat its operation. The constitution requires each House to keep a journal, and declares that certain facts made essential to the passage of a bill shall be stated therein. If those facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the House, and presumed to contain a full and complete history of its proceedings. If a certain act receives the constitutional assent of the body, it will so appear on the face of the journal; and, when a contest arises as to whether an act was thus passed, the journal may. be appealed to to settle it. It is the evidence of the action of the House, and by it the act must stand or fall. It certainly was not the intention of the framers of the constitution that the signatures of the speakers and executive should furnish conclusive evidence of the passage of a law. The presumption, indeed, is that an act thus verified became a law pursuant to the requirements of the constitution, but that presumption may be overthrown. If the journal is lost or destroyed, this presumption will sustain the law, for it will be contended that the proper entry was made in the journal. But when the journal is in existence, and it fails to show that the act was passed in the mode prescribed by the constitution, the presumption is overcome, and the act must °fall." In commenting upon that quotation the learned justice said: "But we are not satisfied that the court intended to express an opinion upon that precise point [the point as to the silence of the journal as to the second reading of the bill]. Although it did not appear in that case that the bill was read the third time before it went to the Senate, or that the yeas and nays were called, no special comment was made by the court upon the silence of the journal as to the bill not being read the third time. Plainly, its language had reference to the fact that the journal did not show the passage (final) of the bill by yeas and nays. It was with reference to that fact that the language above quoted was used." Justice Harlan in that case also comments

upon the case of *Turley v. Logan Co.*, 17 Ill. 152. He quotes the following therefrom, to wit, "The journal should show the readings and the passage of the law by a constitutional vote," and says, "But nothing was said as to what would be the result when the journal did not show that each of the required readings was had." And further on he says: "That we do not misinterpret these decisions is shown in *Schuyler Co. Supervisors v. People*, 25 Ill. 163, where one of the grounds of objection to an act was that the Senate journal did not show that the bill was read three times before it was put upon its final passage. The court said: 'The constitution does not require that every bill shall be read three times in each branch of the general assembly before it shall be passed into a law, but the constitution does not say that three several readings shall be entered on the journals. Some acts performed in the passage of laws are required by the constitution to be entered on the journals, in order to make them valid, and among these are the entries of the yeas and nays on the final passage of every bill; and we held in *Spangler v. Jacoby*, 14 Ill. 297, 58 Am. Dec. 571, and note, that where the journal did not show this the act never became a law. But, where the constitution is silent as to whether a particular act which is required to be performed shall be entered on the journals, it is then left to the discretion of either House to enter it or not, and the silence of the journals on the subject ought not to be held to afford evidence that the act was not done. In such a case we must presume it was done, unless the journals affirmatively show that it was not done.'" After using the language above quoted it is said: "This decision was expressly reaffirmed in *Railway Co. v. Hughes*, 38 Ill. 186. Nothing to the contrary was decided in *People v. Starne*, 35 Ill. 141, 85 Am. Dec. 348, and note, or in *Ryan v. Lynch*, 68 Ill. 161, which is relied upon as modifying or overruling *Schuyler Co. Supervisors v. People*. The case in 35 Illinois recognizes the doctrine of the Schuyler County case, and goes upon the ground that the yeas and nays were not called and spread upon the journals of the House on the passage of the bill. In *Ryan v. Lynch* it appeared from the journal that the bill was read twice in the Senate, but the journal was silent as to the third reading, and it did not show any call of the yeas and nays on

the passage of the bill.   The decision was that as the proceedings of the Senate, certified by the Secretary of the State, were competent proof of the facts stated therein, the failure of the journal to show a call of the yeas and nays was fatal to the bill. Indeed, we do not find that any of the numerous decisions of the state court relating to the passage of bills by the legislature have modified or overruled the doctrine announced in *Schuyler County Supervisors v. People*.  With that doctrine we are entirely satisfied.  It is in harmony with adjudications in many states whose constitutions have provisions similar to those in the constitution of Illinois which we have been considering. . . . . We therefore hold that the mere silence of the Senate journal as to whether the act of 1869 was read the second time in that body does not justify us in holding it to be invalid." The constitutional provision of Illinois under which said decision was made is as follows: "Each House shall keep a journal of its proceedings.  The yeas and nays of the members shall on any question, at the desire of any two of them, be entered on the journal": Const. 1848, art 3, sec. 13.   Section 13, article 3, of our constitution is as follows: "Each House shall keep a journal of its proceedings; and the yeas and nays of the members of each House on any question shall at the request of any three members present, be entered on the journal."  The purpose and intent of the said sections are substantially the same.   In Illinois the yeas and nays must be entered on the journal at the "desire" of any two members, and in Idaho at the request of any three members.   And, so far as the question under consideration is concerned, sections 13 and 21 of article 3 of the constitution of Illinois are substantially the same as sections 14 and 15 of the constitution of Idaho.   Said section 21 of the Illinois constitution provides that on the final passage of all bills the vote shall be by yeas and nays, and shall be entered on the journals, while section 15 of article 3 of the Idaho constitution provides substantially the same.

The weight of authority under constitutions similar to ours, so far as I have examined, is that, unless the journal affirmatively shows that some requirement of the constitution in the passage of a bill has been omitted, the presumption is that such requirement has been complied with, although the jour-

nal be silent in regard thereto, except when the constitution commands such act to be entered on the journal. For example, where the constitution declares that on the final passage of a bill the vote must be by yeas and nays, and entered on the journal, in such a case the act would be held invalid if the journal failed to affirmatively show that such vote was taken and entered as commanded by the constitution. In the case of *Schuyler Co. Supervisors v. People, supra,* it is held, under that provision of the constitution requiring a bill to be read in either House on three different days, that, if the journal is silent as to the readings of the bill, it will be presumed that the bill was read. It is stated in *State v. Illinois Cent. R. Co., supra,* that the decision in the Schuyler County case is in harmony with the adjudications of many states, and the court cites *Miller v. State,* 3 Ohio St. 475; *McCulloch v. State,* 11 Ind. 424; *State v. City of Hastings,* 24 Minn. 78; *English v. Oliver,* 28 Ark. 317; *Chicot Co. v. Davies,* 40 Ark. 200; *State v. Francis,* 26 Kan. 724; *In re Vanderberg,* 28 Kan. 243; *State v. Mead,* 71 Mo. 268. See also, to the same effect, *Pack v. Barton,* 47 Mich. 520, 11 N. W. 367; *Common Council of Detroit v. Board of Assessors,* 91 Mich. 78, 51 N. W. 787; *Walker v. Griffith,* 60 Ala. 367; *Blessing v. City of Galveston,* 42 Tex. 641; *Prescott v. Board of Trustees,* 19 Ill. 324. In *McCulloch v. State, supra,* it was held: "Where the legislative journals are silent touching a step in the proceedings which the constitution requires to be taken in the passage of a bill, it will be presumed by the courts that the constitutional requirements were complied with." It is stated by Judge Cooley, in Constitutional Limitations, sixth edition, at page 167, as follows: "The journals which each House keeps of its proceedings ought to show whether this rule is complied with or not; but in case they do not the passage in the manner provided by the constitution must be presumed, in accordance with the general rule, which presumes the proper discharge of official duty."

On the second point in the opinion in this case we held that amendments to a bill must be read three times on three several days, the same as the original bill. In *People v. Wallace,* 70 Ill. 680, it is held that the constitutional provision requiring bills to be read on three several days before their passage does

not apply to amendments to such bills. Mr. Sutherland, in his work on Statutory Construction, section 49, says: "The readings required on bills are intended to afford opportunities for deliberate consideration of them in detail, and for amendments. Hence amendments are admissible during the progress of a bill through the process enactment. They are not subject to the same rule as bills, in regard to the number of readings. They must be germane to the subject of the bill, and are not required to be read three times; nor does concurrence by one House in amendments made by the other require the yeas and nays, and their entry on the journal, under the provisions for those things, on the final passage of bills." (See, also, *Miller v. State,* 3 Ohio St. 475.) The rule for which I contend does not relieve the members of either House from keeping their oaths of office, and, if they conscientiously keep them inviolate, they will see to it that each and every constitutional requirement in the enactment of laws is fully and fairly met. The commands found in sections 13-15, article 3, of the constitution of this state, are directed to the members of the legislature, and their oaths of office require them to see to it that the provisions of those sections are conscientiously complied with. The rule holding that, if the journal is silent upon matters which are not expressly required to be entered thereon in the passage of a bill, the presumption is that the legislature complied with the requirements of the constitution, does not relieve the legislature from keeping a full and complete journal of its proceedings; and under the first clause of section 13, article 3, it is commanded to do so. My conclusion is that a law passed by the legislature should not be held invalid because of the fact that the journals fail to show that each and every act required by the constitution to be done in the passage of such law had been done, unless such act or proceeding is expressly commanded by the constitution to be entered on the journal. As, for instance, the vote on the final passage of a bill is commanded by the constitution to be taken by yeas and nays and entered on the journal. If the journal was silent as to the yeas and nays being taken, in such case the court would have jurisdiction to hold such bill invalid, and should do so; but if the journal was silent as to the printing of the bill, and the three several read-

ings in each House, and of the adoption of an amendment by yea and nay vote, as those acts are not expressly commanded to be entered in the journal, the presumption would be that those necessary acts were done, and such bill held valid. Otherwise if the journal fail to show the final passage of such bill by a yea and nay vote, as the final passage of a bill is expressly commanded to be by yeas and nays, and entered on the journal. And, further, that amendments to a bill are not subject to that provision of the constitution requiring bills to be read on three several days in each House. The original opinion should be modified as above indicated, or a rehearing granted.

QUARLES, J., Concurring.—I concur with the views expressed in the opinion of Mr. Justice Huston in this case. His conclusions, and the reasons given therefor, I regard as being in perfect harmony with the letter and spirit of our constitution. Mr. Chief Justice Sullivan, while concurring with the conclusion reached in this case, does not agree with the majority opinion on two points which I will briefly discuss.

1. That the legislative journals must affirmatively show a compliance with the requirements of the constitution in the passage of a bill, the validity of which is questioned. Upon this point we are cited to a number of authorities, and furnished with a number of quotations. But a careful study of the authorities cited is all that is needed to show that the rule therein announced is based merely upon precedent—because some court has so decided—and not upon reason and common sense, the basis and foundation of all law. The careful and painstaking student finds many inconsistencies in the authorities touching constitutional questions. A careful study of the adjudicated cases leads to the conclusion that both the legislative and judicial departments of government of several of our states have chafed under the limitations and restrictions imposed by constitutions, and that they have at times done indirectly what the constitution directly forbids. In one case cited by Mr. Chief Justice Sullivan the constitution prohibited the introduction of any bill after the fiftieth day. A bill to incorporate a township had been introduced in due season, but after the fiftieth day a substitute for this bill, incorporating a city outside

of the limits of the proposed township was introduced and adopted. The title and subject matter of the original bill were entirely changed, and in lieu thereof a new title and a new proposition or subject matter was substituted. The substitute bill passed, and was approved by the governor. The court held the act valid. In another case which he cites from the same court a bill to incorporate a township had been introduced before the fiftieth day, but after the fiftieth day a substitute for such bill, for the purpose of incorporating a county out of the same territory, was introduced, adopted, and passed. The court held this bill valid. It is apparent that the object of said provision was to prevent the introduction and "railroading" of bills through the legislature during the last days of its session, and that the legislature should have the last ten days of its session to devote to those propositions which had been submitted to it prior to the fifty-first day of its session. But in both of these cases the object of the provision was wholly defeated, and the legislature, under the guise of amendment or substitute, did indirectly what was expressly prohibited by the constitution. The object and purpose of creating a city, a township or precinct, and a county, as well as the powers exercised by each, are so entirely different that it is difficult to see how the court held the amendment or substitute in either of these cases germane to the original bill. In the first case it is easy to see that the entire population of the county might be heartily in favor of creating the proposed township. It is easily conceived that the people of the county might have been opposed to creating the new city, and perhaps a good majority of the residents of the new city were opposed to the incorporation of it; and it requires no great stretch of imagination to surmise that in the last case the great majority of the people of the old county were opposed to any division of such county, or the creation of a new county out of part of their territory. Perchance, in both cases, the people immediately interested, after carefully watching the proceedings of the legislature to see if any proposition affecting their local government and interest, to which they were opposed, should be introduced into their legislature, at the end of the fiftieth day saw that none had been introduced, and relying upon the aforesaid provision in their constitution,

and believing that no such proposition could thereafter be proposed, ceased their vigilance, and quit watching the proceedings of their legislature. The existence of such conditions is suggested by the fact that the proposition to create the city in the one case, and the new county in the other, came in under mask, and not openly and in the usual way. It was doubtless through such apparent violations of plain constitutional provisions that Judge Cooley was induced to comment upon such frauds by giving the illustrations of substituting, by amendment, for the proposition to incorporate the city of Siam, the proposition to dam the Wild Cat river, so aptly quoted by Mr. Justice Huston. The lessons to be learned in these two cases show the wisdom of obeying the constitution in letter and spirit, the necessity of refusing to recognize as law any act which is expressly prohibited by the constitution, whether passed directly and above board, or passed indirectly, under cloak, or the habiliment of fraud, and show the ease with which the plain provisions of the supreme law of the land can be evaded and effectually defeated by the joint action of the legislature and the courts. Now, courts do not make, but must obey and enforce, the law. In our constitution we find the supreme standard by which all statutory enactments are to be measured and judged. If, in a given case, the court must and does apply this standard, and finds that the statute falls short of the required measure, the court's duty is plain. In such case the court has no discretion, but must follow the constitution, or else, as was said by Judge Cooley, be guilty of "a violation of official oath and public duty." If courts, through fear of appearing indelicate, recognize acts which are prohibited by the fundamental law, when such acts are indirectly committed, they are not discouraging, but encouraging, fraud, and are not closing the gates to fraud, but opening them and inviting entrance thereto.

As evidence of the inconsistencies of writers upon constitutional law, read the quotations from Mr. Sutherland, Judge Cooley, and Mr. Black given by my associates in this case. Then carefully study all of the authorities cited. How, then, are we to determine whether a bill becomes a law or not? In my opinion there is but one way to ascertain, and that is to

look to the journals to see if the legislature has done those things commanded by the constitution. The object of requiring the legislature to keep a journal of its proceedings, in my opinion, is that the people, from whom all power comes, may have positive and permanent record evidence as to what has become law and what has not. Under this view it becomes absolutely necessary that the journals show that the steps expressly commanded by the constitution in the passage of a bill were taken. I confess that it is embarrassing for a court to take this position. To avoid such embarrassment, for reasons of expediency, and on account of a so-called public policy, some of the courts have adopted the view of Mr. Chief Justice Sullivan—that, in order to hold a statute void for the reason that it was not passed in the mode required by the constitution, it must affirmatively appear by the journals that some constitutional requirement was not obeyed, and that the silence of the journal as to whether a requirement was obeyed or not is not sufficient to authorize the court to hold that such requirement was not obeyed. This proposition involves the absurd anomaly of requiring the plaintiff to prove a negative, and to prove it by a dumb witness—one who does not speak, but is silent upon the question at issue. We will illustrate the absurdity of the proposition by supposing the following case, to wit: A bill is introduced into the Senate, and read one time. When the second reading of bills is reached the next day, this bill, owing entirely to oversight, is overlooked, and not read the second time. Under these circumstances, the Senate journal is silent as to the second reading, and does not say whether it was read the second time or not. Afterward what should have been the third reading occurs, and the journal so shows. The bill passes both Houses, and is signed and approved. Now, bear in mind that the bill was not read three times in the Senate, but only twice. The journals show what was done, but do not show what was not done. By the express terms of the constitution, this bill is not law, because it was not read three times by each House of the legislature. Now, applying the doctrine of presumption contended for by Chief Justice Sullivan, that because the journal does not say in so many words "this bill was not read three times," the court must,

by presumption, supply the second reading, and thus make a
law which the legislature did not, according to the constitution,
make, and you effectually eliminate this provision from the con-
stitution.    If the court can read the bill for the legislature one
time, it may do so two, or even three, times.    If the journal
need not necessarily show anything in regard to the passage
of a bill except the final vote thereon, then the legislature may
fail to read a bill at all, and by refusing to say anything about
the reading of it the court must say that it was read three times,
because the journal does not expressly say that "this bill was
not read three times."    The idea is monstrous, and the danger
of such a rule is fully apparent, and its adoption would be
tantamount to a refusal to obey and support the constitution.

The functions of the legislature consist exclusively in making
laws, with but few exceptions.    Then why command it, in the
supreme law of the land, to "keep a journal of its proceedings,"
unless the journal is to show what bills have been enacted into
law?    Mr. Chief Justice Sullivan says in his opinion that the
first clause of section 13, article 3, of the constitution, "com-
mands the legislature to keep a full and complete journal of its
proceedings."    This is undoubtedly true, and it is apparent that
the object of this provision is to make the legislature show what
it has done, leaving nothing whatever to implication.    And,
when the legislature says what it has done with regard to the
passage of any bill, it negatives the idea that it has done any-
thing else in regard thereto.    Silence proves nothing where one
is commanded to speak.    But in such case the refusal of the
witness to say that he did that which he should have done
would justify the presumption that he did not do it.    Our con-
stitution commands certain things to be done in regard to the
passage of a bill, and says that no bill shall become a law unless
these things are done.    It seems a travesty upon our supreme
law to say that it guarantees to the people the right to have
their laws made in this manner only, and that there is no way
of enforcing this right, or for the court to say that this is law
when the constitution says it is not law.    There is one safe
course which is in harmony with the constitution, and that is
to adhere to the rule that the legislature must show, as com-
manded by the constitution, that it has done everything re-

quired by the constitution to be done in the serious and impor-
tant matter of making laws.   This is the rule of evidence pro-
vided by the constitution.   It is not presumptuous in the courts,
nor disrespectful to the legislature, to judge the acts of the
legislature by its own evidence; and, as said by Mr. Chief Jus-
tice Sullivan in his opinion herein: "The commands found in
sections 13, 14, and 15, article 3, of the constitution of this
state, are directed to the members of the legislature, and their
oaths of office require them to see to it that the provisions of
these sections are conscientiously complied with."   The only
difference between us is that he thinks that, in courtesy to the
legislative department, the judiciary should, by presumption,
supply its omissions, while I cannot think so.   To deal fairly
with the legislature, and at the same time support the consti-
tution in letter and intent, we should judge the acts of the leg-
islature by its own evidence—neither adding anything thereto
nor taking anything therefrom.   It is not presumptuous, indeli-
cate, or disrespectful for the court to say: "We presume that
the legislature obeyed the obligations of the official oath, and
recorded in its journal every step taken by it in the passage of
this bill.   And because the journals do not show that this bill
was read the second time in the Senate, or that such reading
was, on account of urgency, dispensed with by two-thirds of
the Senate on an aye and nay vote, we presume that the second
reading was inadvertently overlooked in the Senate, and did
not occur.   And because this bill was not read three times in
each House, the constitution says it is not law, and we cannot
recognize it as law."   This is, to my mind, the only safe and
correct rule.   It imposes no duty not enjoined by the constitu-
tion, and works no hardship.   Its observance simply carries out
the provisions of the constitution, in letter and spirit, preserves
the constitutional right of the people to have their laws made
in a careful and considerate manner, and properly respects the
integrity of the legislative department.   But violations of the
express mandates of the constitution by the legislature, whether
occurring through inadvertence or otherwise, cannot be toler-
ated.   To prevent fraud, and to avoid the probable error of the
court adjudging an act passed by the legislature to be law which
by the constitution is not law, the court is compelled to adopt the

rule that the journals of the legislature must affirmatively show that the express requirements of the constitution were complied with in the enactment of any law which is attacked on the ground that it was not passed in the manner required by the constitution. The journal is read in each House daily, and it is proper to conclude that the members and officers will see that it is correct. In fact, the journal is kept under the immediate supervision of each member. It is no great burden for the members to see that bills are reported, printed, read three times, and passed by an aye and nay vote, and that these steps are shown by the journals. The constitution requires it, and, being so required, courts should take the journals for what they say, and regard them as telling "the truth, the whole truth, and nothing but the truth." We do not impugn the integrity of the legislature. We think the fault lies principally in the fact that the legislature has followed the procedure of its territorial predecessors and that of our national Congress, inadvertently overlooking the fact that our state constitution imposes limitations and restrictions upon the legislature which were not imposed upon the territorial legislature or upon Congress; there being no provision in the federal constitution requiring Congress to read all bills three times, etc.

Our views of the good faith and integrity of the legislature can best be expressed by quoting the language of the supreme court of the state of California in the case of *Weill v. Kenfield,* 54 Cal. 111, as follows: "To our respect for a co-ordinate department of the state government is added our personal regard for the distinguished gentlemen who have so ably presented the view of this case from which we have felt constrained to dissent. We might freely admit that none of the restrictions of the constitution would be necessary to the proper discharge of their duties by the honorable gentlemen who compose the present assembly. But the people may not always be so happy in the choice of their representatives, and we deem it our duty to require a strict compliance with mandatory provisions intended to prevent evils in the past, and which may reappear in the future." The doctrine of presumption, as applied by Chief Justice Sullivan to the passage of bills, originated in England, where they have no written constitution. The Eng-

lish rule stops all inquiry at the enrolled bill, while the rule
contended for by Mr. Chief Justice Sullivan permits the court
to go back of the enrolled bill to the journal, to see if it passed
by the required aye and nay vote, supplying everything else
that the journal is silent about.  The rule for which he con-
tends is the English rule with a slight modification.  If the
court is to supply the principal part of the evidence by pre-
sumption, it would be more consistent to supply it all, and re-
fuse to go back of the enrolled bill.  In *Weill v. Kenfield, supra,*
the supreme court of California, in discussing the question un-
der consideration, say: "It was intended by and declared in the
clause so often referred to that the reading of a bill shall no
longer be implied from the mere silence of senators or assem-
blymen, but that the consent of the House in which the bill is
pending to a waiver of the actual reading shall be indicated
only by a formal vote of 'yeas and nays,' when two-thirds shall
declare that an 'urgency' has arisen which renders it proper to
dispense with the reading.  The vote upon dispensing with the
reading goes upon the record, so that each representative may
be held responsible to his constituents for his conduct in re-
spect to this, as well as other questions.  The entry must now
accord with the fact.  It was not to be entered in the journal,
as was often formerly the case, that a bill is read when it is
not read.  It must either be read, or the members called on to
declare affirmatively that it shall not be read, because of press-
ing and urgent necessity.  We do not dare to determine that
any constitutional prerequisite to the validity of a law is of
no practical service.  It may be, as suggested, that the evil
effects of the delays caused by the interpretation of the language
of the constitution we have adopted may more than counterbal-
ance any benefits that may accrue to legislation by the addi-
tional opportunities afforded each lawmaker to become ac-
quainted with the contents of all bills.  But we are not per-
mitted to consider the policy of a provision, where its language,
as in the present instance, seems to us plain and positive.  The
whole of this line of argument is disposed of by the phrase,
*'Ita lex scripta est.'"*  In *People v. Starne,* 35 Ill. 121, 85
Am. Dec. 348, and note, the supreme court of Illinois use this
language: "Were it not for the somewhat peculiar provision of

our constitution, which requires that all bills, before they can become a law, shall be read three several times in each House, and shall be passed by a vote of a majority of all the members elect, a bill thus signed and approved would be conclusive of its validity and binding force as law. But this provision having been adopted to prevent improvident legislation, and to prevent the enforcement of bills that were never enacted into laws, the means of its enforcement are implied. It is true that these means are negative, and not positive, in their character. Whilst neither of the other co-ordinate branches of the government have authority to command its observance, the judicial and executive departments are not bound to enforce such bills as laws. Whilst they are *prima facie* binding, still, when it appears from the journals that either of these constitutional requirements is wanting, the provisions of the bill will not be enforced. According to the theory of our legislation, when a bill has become a law there must be record evidence of every requirement from its introduction until it becomes a law, and this evidence is found upon the journals of the two Houses." In the last two sentences the learned Illinois court simply expresses in other words the rule announced in the original opinion in this case, viz., that the journals must affirmatively show that the requirements of the constitution were complied with by the legislature in the passage of a bill the validity of which is questioned. With all due deference to Judge Harlan, for whose learning and eminent ability I have the profoundest respect, I must say that his interpretation of the above language of the supreme court of Illinois seems strained and unauthorized. The same learned court, in *Ryan v. Lynch,* 68 Ill. 160, held that the certificate of the Secretary of State, giving "full and true copies of the journals of the Senate and House of Representatives, so far as the same relate to the passage of the bill," was competent evidence to prove "the nonexistence of any particular fact." The nonexistence of the fact is shown by presenting the journal, or full copies thereof, from which it appears that certain steps were not shown. The journal showed what facts existed. It should have shown other facts. Its failure to do so proved their nonexistence.

Touching the second point discussed by Mr. Chief Justice Sullivan, I shall content myself with saying that Mr. Sutherland cites as sustaining the rule that amendments need not be read three times only three cases, to wit: *Miller v. State,* 3 Ohio St. 475; *People v. Wallace,* 70 Ill. 680; *State v. Platt,* 2 S. C. 150, 16 Am. Rep. 647. The two last-named cases merely mention the rule, and do not attempt to give any reason whatever in support of it. And in the Ohio case, after saying that "it is not unusual, in parliamentary proceedings, to amend a bill by striking out all after the enacting clause and inserting a new bill," the court proceeds to say: "When the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days, but when there is no such vital alteration three readings of the amendment are not required." Notice that the vital alteration consisted in wholly changing the subject or proposition of the bill. Did the learned court mean to convey the idea that, if some part of the subject or proposition remained—a one-hundredth part, for instance—it was not necessary to read the amendment, although it should wholly change ninety-nine hundredths of it? Such a rule is not based upon reason. The reasoning on this point in the opinion of Mr. Justice Huston herein is so clear and consonant with common sense, and so apparently in harmony with the evident intent of our constitution, that I accept it fully, and refuse to blindly follow a small number of precedents that are not based upon reason and common sense, but opposed to the letter and intent of our constitution. For the reason that it is the unanimous opinion of the court that the act in question is void, a rehearing is properly denied.