(May 4, 1912.)

## A. J. SWAIN, Appellant, v. HARRY K. FRITCHMAN, Mayor, et al., Respondents.

[00 Pac. 000.]

LEGISLATIVE ACT—PASSAGE OF ACT—CONSTITUTIONAL REQUIREMENTS— CITIES AND VILLAGES—CLASSIFICATION OF CITIES AND VILLAGES— SPECIAL CHARTER CITIES—COMMISSION GOVERNMENT ACT—CHANGE OF CLASSIFICATION—MUNICIPAL OBLIGATIONS—IMPAIRMENT OF CONTRACT.

(Syllabus by the court.)

1. Question raised but not decided as to whether a taxpayer as such, in his individual and private capacity, can maintain an action against the city authorities to enjoin and restrain them from holding an election under the provisions of a statute which the plaintiff maintains is unconstitutional and void.

2. Legislative journals examined containing the entries and record of the introduction, amendment and passage of House Bill No. 233, known as the Black Law or commission government act, and *held* that the journals show a substantial compliance by the

legislature with the requirements of sec. 13, art. 3, of the state constitution in the passage of the act.

3. Under the provisions of sec. 1 of the act of March 13, 1911, known as the Black Law or commission government act (1911 Sess. Laws, p. 280), it is specifically provided that any city within the state organized under a special charter may adopt the provisions of the new form of government, and sec. 3 of the same act recognizes that the provisions thereof may be adopted by a special charter city, and provides "that no provisions of any special charter or other special act or law which any such city may be operating under at the time of its becoming organized under this act, shall thereafter be applicable to such city," etc.

4. Under the provisions of sec. 3 of the commission government act, a special charter city which has decided by popular vote, in accordance with the provisions of the act, to adopt the commission form of government, is thereafter subject to and governed by all the general laws of the state governing or pertaining to cities of the second class which are not inconsistent with the provisions of the commission government act.

5. The words "such cities" as used in sec. 3 of the act of March 13, 1911, mean cities of the class to which the one adopting the new form of government belongs if existing under the general laws, or would legally belong if it were organized and operating under the general laws of the state.

6. In construing legislative acts, it is not the business of the court to deal in any subtle refinements, but it is rather its duty to ascertain, if possible, from a reading of the whole act the purpose and intent of the legislature and give force and effect thereto.

7. Under the general incorporation laws of the state, a city of the second class was the highest class of cities which was recognized or provided for by the law-making body at the time of the adoption of sec. 2170 of the Rev. Codes; and the fact that the statute provided that cities of a population of from 1,000 to 15,000 should be known as cities of the second class does not signify that the law-making body meant or contemplated that a city should become disorganized or disincorporated by reason of its growth to exceed the maximum population of 15,000, and a city so incorporated would continue to exercise the powers and functions of a city of the second class, although its population should exceed the maximum of 15,000.

8. Under the provisions of sec. 1, art. 12, of the constitution, cities and towns organized prior to the adoption of the constitution may become organized under the general laws when a "majority of the electors at a general election shall so determine, under such provisions therefor as may be made by the legislature."

Under the terms of this constitutional provision, it is not necessary that the legislature submit to the electors the question as to whether they will surrender a special charter, but they may submit the question as to whether they will adopt some general legislative act and become organized and operate thereunder.

9.   The Black Law or commission government act is a general and not a special law, and applies equally to all cities of the state having the required population that see fit to adopt its provisions by a popular vote.

10.   The act of March 13, 1911, known as the commission government act, does not tend or purport to repeal any of the provisions of any bonding ordinance of Boise City, and does not purport or attempt to impair any bond or other obligation of the city, but, on the contrary, specifically provides that the new form of government, if the same shall be adopted by any city, shall still be liable for all the outstanding obligations of the city as they then existed.

11.   The remedies given by law for the enforcement of contracts created by bonding ordinances and the sale of bonds thereunder cannot be altered or diminished so as to impair the substantial rights or interests of the holders of such obligations.

12.   Under the provisions of secs. 25, 26, and 74 of the act of March 13, 1911, known as the commission government act, it was clearly the intention of the legislature that "ordinances making the annual tax levy and appropriations" should go into effect immediately upon their passage, and that they should not be subject to the referendum provisions of that act.

APPEAL from the District Court of the Third Judicial District for Ada County.   Hon. Carl A. Davis, Judge.

Action by plaintiff to enjoin and restrain the defendants from holding a city election.   Judgment for the defendants and plaintiff appealed.   *Affirmed.*

E. G. Davis, and Richards & Haga, for Appellant.

Sec. 13, art. 3 of the constitution means that each house must keep a full and complete, not a partial, journal of its proceedings.   (*Cohn v. Kingsley,* 5 Ida. 416, 49 Pac. 985, 38 L. R. A. 74.)

There cannot be a classification of cities under the provisions of art. 12 of the constitution, unless there shall be made applicable to cities under this classification some uni-

form and definite set of laws. (*Ayar's Appeal,* 122 Pa. 226, 16 Atl. 356, 2 L. R. A. 577.)

Municipalities within the new classification which the said act creates will not be governed by uniform laws, which is clearly required by the provisions of sec. 1, art. 12 of the constitution. (*Ex parte Jackson,* 143 Cal. 564, 77 Pac. 459.)

"To whatever class a law may apply, it must apply equally to each member thereof." (*Johnson v. City of Milwaukee,* 88 Wis. 383, 60 N. W. 270.)

"A system of municipal government in which cities of the same class may have dissimilarity in character of organization as well as different powers is not a uniform system within the meaning of the constitution." (*McConihe v. State,* 17 Fla. 238; *People v. Cooper,* 83 Ill. 585.)

Equality of privilege can constitutionally be made to depend only upon equality of population. (*State v. Tausick,* 64 Wash. 69, 116 Pac. 655.)

P. E. Cavaney, and Charles F. Reddoch, for Respondents.

This act has been before this court in the case of *Kessler v. Fritchman, ante,* p. 30, 119 Pac. 692, and all of the alleged grounds of unconstitutionality set forth by appellant in paragraphs 16 to 30, inclusive, of his complaint have been settled in that case. (See, also, *State v. Tausick,* 64 Wash. 69, 116 Pac. 651, and cases there cited.)

The unsoundness of the *dicta* laid down in the case of *Cohn v. Kingsley* has been subsequently overruled and modified in the case of *Tarr v. Western Loan & Savings Co.,* 15 Ida. (rehearing) 751, 99 Pac. 1049, 21 L. R. A., N. S., 707.

The great weight of authority as announced by the United States supreme court in *Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. ed. 294, and sustained by the unbroken line of English authority and the common-law rule is the law that should govern the action of a court in attempting to impeach the record of the legislative journals.

In the case of *State v. Chester,* 39 S. C. 307, 17 S. C. 752, the court reversed the rule, notwithstanding it had been twice declared and followed in that judiciary.

The following cases of the U. S. supreme court sustain the doctrine announced in *Field v. Clark, supra: United States v. Ballin,* 144 U. S. 3, 12 Sup. Ct. 507, 13 L. ed. 321; *Lyons v. Woods,* 153 U. S. 662, 14 Sup. Ct. 959, 38 L. ed. 854; *Harwood v. Wentworth,* 162 U. S. 558, 16 Sup. Ct. 890, 40 L. ed. 1069. See, also, *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201, 23 L. R. A. 340; *De Loach v. Newton,* 134 Ga. 739, 20 Ann. Cas. 342, 68 S. E. 708; *Lafferty v. Huffman,* 99 Ky. 80, 35 S. W. 123, 32 L. R. A. 203; *Richardson v. Young,* 121 Tenn. 471, 125 S. W. 664.

McCready Sykes, *Amicus Curiae.*

Statutory powers and duties of taxation existing at the time money is borrowed and bonds are issued by a municipal corporation cannot be substantially impaired or abrogated by the legislature. (*Von Hoffman v. City of Quincy,* 4 Wall. (U. S.) 535, 18 L. ed. 403.)

Chapter 82 of the Laws of 1911 impairs the obligations of existing contracts between the city of Boise and its bond-holders, for it abolishes the offices of mayor and common council without providing for new officers lawfully obligated to levy taxes to meet contract requirements; all the powers of the council under the Black Law being subject at all times to the paramount and arbitrary power of a popular "referendum." (*Louisiana v. Pilsbury,* 105 U. S. 278, 26 L. ed. 1090; *Mobile v. Watson,* 116 U. S. 289, 305, 6 Sup. Ct. 398, 29 L. ed. 620; *Planters' Bank v. Sharp,* 6 How. (U. S.) 327, 12 L. ed. 458.)

"A creditor has a right to the substance of the contract as he made it. It is his privilege to judge for himself whether it is for his interest for the agreement to be discharged in the particular way stipulated or in a different mode; and neither the courts nor the legislature can change it in any substantial particular." (*People v. Bond,* 10 Cal. 563.)

Gustave Kroeger, H. S. Kessler, and Frank Martin, *Amici Curiae,* cite no authorities on points decided.

AILSHIE, J.—This action was instituted in the district court by the plaintiff as a taxpayer against the mayor and members of the common council of Boise City, to enjoin and restrain them from holding a city election under and in pursuance of a proclamation issued by the mayor on March 4, 1912, which proclamation was made in pursuance of the provisions of the act of the legislature, approved March 13, 1911 (1911 Sess. Laws, p. 280), known as the Black Law or the commission government act. The trial court denied the application, and the plaintiff has appealed.

In addition to counsel who represent the respective parties to this action, Gustave Kroeger, H. S. Kessler and Frank Martin, as *amici curiae*, appeared and were allowed to make oral argument and submit a brief in support of the judgment of the lower court; and McCready Sykes appeared and made argument and filed a brief as *amicus curiae* in behalf of the appellant.

*Amici curiae* have raised the point that the appellant does not show such interest as to enable him to maintain an action to enjoin the holding of an election,—that the question involved is a purely political question, and a taxpayer as such has no individual or personal right to maintain an action to restrain or enjoin the exercise of the political power of the municipality. In support of this position, counsel has cited the court to the case of *City Council of McAlester v. Milwee* (Okl.), 122 Pac. 173; 2 Joyce on Injunctions, pp. 2033–2037; 22 Cyc. 885. In view of the public importance of having the questions raised in this case decided, and for the further reason that this question was not raised in the trial court, we have concluded to reserve our judgment on the point raised and pass directly to a consideration of the merits of the case.

1. It is contended that the act of March 13, 1911, known as the Black Law or commission government act, is void, for the reason that it was not passed by the legislature in accordance with the requirements of sec. 13, art. 3 of the constitution. The particular defects and failure to comply with the provisions of the constitution urged by appellant

are as follows: After the bill (H. B. No. 233) had been introduced and given the first and second readings and referred to the appropriate committee, we find from the house journal that on February 25th the "committee of the whole" made the following report to the house: "The committee of the whole has had under consideration the general calendar and recommend that the amendments to the following house and senate bills be adopted: Nos. 129, 314, 268, 83, 378, 191, 379, 233, 171, 149, 372, 287, 162, 251, 327, 430, 354, 297, 86, 296, and 342 and senate bill No. 150 . . . . " Upon the filing of this report, the journal shows that "Black moved the adoption of the report. Seconded by Davis. Motion carried." It is contended that the house by this action attempted to adopt amendments in *omnibus* form by *viva voce* vote to twenty-two house bills and one senate bill, and that no single amendment is given, and that no separate action was taken on each bill, and that such a procedure is fatal to each and every bill thus attempted to be amended. The foregoing action, as we view it, was merely the acceptance of the report of the committee. It was evidently not considered as the final action on each separate bill in reference to the particular amendment proposed to such bill. We find further along in the journal entries of the proceedings of the same day, February 25th (House Journal, p. 437), where Black moved a "suspension of the rules and that that portion of sec. 15, art. 3 of the constitution requiring a reading of bills on three several days be dispensed with on the ground that an urgency existed and that amendments to House Bill No. 233 having been printed be read the first and second times and referred to the engrossing committee with the original bill." This motion was adopted by an aye and nay vote. The journal further recites that "amendments to H. B. No. 233 were then read first and second times and with original bill referred to the engrossing committee and ordered engrossed." This entry shows that the *amendments had been printed* before being read the first or second time. It was unnecessary to suspend the rules or the provisions of the constitution for the first reading. The motion

to suspend the rules and the provisions of the constitution with reference to reading on three several days was properly made and carried, and afforded the constitutional authority for giving the amendments a *second reading* on the same day as the first reading. It is contended that these amendments must not have been printed until after the passage of the bill, for the reason that the journal entry of February 28th (House Journal, p. 482) contains a report of the committee on printing wherein they say, "Your committee on printing herewith report that we have had correctly printed and distributed the following: Amendments to House Bills Nos. . . . . 233 . . . . " This entry, however, is not contradictory to or in conflict with the entry of February 25th, which recites that the amendments had been printed at the time they were given the first and second readings. The committee report does not show *when* the committee had the amendments printed and distributed, nor does it show *when* the report of the printing committee was made. It is not dated, but it was presumably filed with the clerk of the house on February 28th, and for that reason was entered in the proceedings of that day. Taking the two entries together, the one of February 25th and the one of February 28th, it is reasonably certain that the amendments had been printed and distributed among the members on or prior to the 25th, and that the printing committee's report thereon did not find its way into the journal until the 28th. Appellant contends, further, that the journal affirmatively shows that the bill was never given a third reading as required by the constitution. This contention is based upon the fact that the journal shows, under date of March 1st (House Journal, p. 522), that "House Bill No. 233 by Black read a third time at length section by section, for final action. The question being, 'Shall the bill pass,' the roll was called with the following result: . . . . and so the bill passed, title was approved, and House Bill No. 233 was ordered transmitted to the senate." A subsequent entry in the journal under the same date reads as follows: "We, your committee on engrossed and enrolled bills, report House Bill No. 233 correctly

engrossed. Glennon, Chairman: Report received and H. B. No. 233 filed for third reading.'' Now, the fact that this entry appears in the journal after the entry showing the passage of the bill affords no evidence that the bill had not been previously given a third reading and passed by an aye and nay vote as recited by the previous entry of the same day. It is probable, however, that the report was in fact made and the engrossed bill was filed prior to the third reading and passage of the bill and that the journal clerk got the order reversed in making his entries. This bill as shown by the foregoing entry was transmitted to the senate on March 1st. The senate journal of March 2d, among the first entries of the day, contains a message from the chief clerk of the house transmitting House Bill No. 233. It is clear, therefore, that this bill was engrossed on March 1st as shown by the house journal, and that it was transmitted to the senate on that day and noted among the senate proceedings of the following day. It is immaterial for the purposes of our consideration whether the bill was engrossed prior or subsequent to the third reading. We would ordinarily suppose that the bill was engrossed after its final passage preparatory for the signatures of the presiding officers of the house and senate and the approval of the governor, but an examination of the journal with reference to this and other bills passed at the same session indicates to us that it was the practice of the house of representatives to refer a bill immediately after its second reading to the engrossing committee and order that it be engrossed. (House Journal, p. 438.) This bill had been transmitted to the senate, as shown by the above quotation from the journal, and we find that under date of March 3d (House Journal, p. 554), the journal shows a message from the assistant secretary of the senate in which he says he transmits "therewith . . . . House Bills Nos. 94, 233 and 376 which have passed the senate." According to the wording of this message with reference to other bills, it would appear that House Bill No. 233 had passed the senate without amendment. The senate journal,

pp. 320 and 325, shows that the bill was in fact passed in the senate on March 3d and transmitted to the house.

Now, we have the following things appearing clearly from the house journal entries: First, that amendments to the bill were recommended by committee of the whole; second, that these amendments were printed before they were given a first reading; third, that the rules and the provisions of the constitution were suspended with reference to the second reading; fourth, that the bill was read at length and passed by an aye and nay vote and thereupon transmitted to the senate; fifth, that the senate passed the bill as it came from the house and returned the same to the house. The house journal again, under date of March 4th (House Journal, p. 619), contains a report from the committee on engrossed and enrolled bills, reporting House Bill No. 233 as having been correctly "enrolled," and immediately following this entry the journal shows that "the speaker in the presence of the house signed the following bills . . . . 233."

We fail to find wherein the legislature in the passage of this act has departed in any substantial manner from the method prescribed by the constitution for the passage and enactment of bills. It seems to us that the journal entries show a substantial compliance with the provisions of sec. 13, art. 3 of the constitution. It also complies with the holdings of this court in *Cohn v. Kingsley,* 5 Ida. 430, 49 Pac. 985, 38 L. R. A. 74, and *Tarr v. Western Savings & Loan Assn.,* 15 Ida. 751, 99 Pac. 1049, 21 L. R. A., N. S., 707. It is true that the court indulged in considerable *dicta* in the Cohn-Kingsley case which was in no way essential to the decision of that case and to which we would not feel disposed to give our approval, but we would not be inclined at this time to depart from the general rule there enunciated that the court may look to the journal. It would certainly be a remarkable and appalling situation if in the rush, hurry and turmoil of the closing hours of a legislative session a purported bill could be engrossed, certified and filed with the secretary of state and become a law which in fact had never passed the legislature nor been considered by it, and the journals clearly

established that fact, and yet there should be no remedy whereby the fraud or mistake could be reached and the purported act could be prevented from going into force and operation as a law. If courts cannot go behind the enrolled bill, this would be the exact situation, and yet the case supposed has actually occurred in this state. A bill was enrolled, certified and filed with the secretary of state as a valid act of the legislature where the legislative journals showed affirmatively that the bill had been defeated instead of passed.

2. It is next contended that the Black Law or commission government act is void and inoperative as to a special charter city, and cannot be applied to or be put in operation in such a city, for the reason that the general laws of the state applying to municipal corporations do not apply to such cities, and that the commission government act is not a complete city government act and does not purport to be such, and that therefore a special charter city adopting such act will be left without any complete or adequate law or authority for administering city government and discharging municipal duties and obligations. This argument is based chiefly upon the provisions of sec. 1, art. 12 of the state constitution and sec. 3 of the act here in question. (1911 Sess. Laws, p. 284.) Sec. 1, art. 12, of the constitution provides as follows:

"The legislature shall provide by general laws for the incorporation, organization and classification of the cities and towns, in proportion to the population, which laws may be altered, amended, or repealed by the general laws. Cities and towns, heretofore incorporated, may become organized under such general laws, whenever a majority of the electors at a general election, shall so determine, under such provisions therefor as may be made by the legislature."

In *Kessler v. Fritchman, ante,* p. 30, 119 Pac. 699, this court, in discussing the same question here involved and considering the foregoing provisions of the constitution, said:

"Under the constitution the legislature is clearly authorized to classify towns, cities, and villages of the state according to the population, and while the legislature by general laws has made a classification of cities, towns, and villages, this would

not preclude or prevent the legislature in enacting the law now under consideration, and the reclassification of cities, towns, and villages as cities, according to population, as a prerequisite to adopting the form of government provided in the act now under consideration.''

Without further comment on this constitutional provision, suffice it to say that we are still content with our holding to the effect that the act of March 13, 1911, known as the commission government act, is not in conflict with this section of the constitution, and it was within the power and authority of the legislature to enact the same.

Sec. 3 of the act in question provides as follows: ''All general laws of the state of Idaho governing or pertaining to such cities and not inconsistent with the provisions of this act, shall apply to and govern cities organized under this act; Provided: That no provisions of any special charter or other special act or law which any such city may be operating under at the time of its becoming organized under this act, shall thereafter be applicable to such city while it is operating under the provisions of this act.''

Now, it is contended by counsel for appellant that the word ''such'' as used in the foregoing statute refers to *the particular* city adopting the new form of government, and that since a *special charter city* is not governed by any general laws or any laws other than the special charter, the act cannot therefore apply to such cities. It should be borne in mind that this act specifically provides ''that no provisions of any special charter or other special act or law which any city may be operating under at the time of its becoming organized under this act, shall thereafter be applicable to such city while it is operating under the provisions of this act.'' This shows clearly that it was intended that the act should apply to special charter cities, and renders it reasonably certain that the word ''such'' in the preceding portion of the section cannot mean what is contended for it by appellant, but, on the contrary, means a city of like size under the ''general law'' classification. It should also be remembered that sec. 1 of the act specifically provides that it shall apply to ''any city

within the state of Idaho organized under special charter or
under a general incorporating act,'' etc.    It is reasonable and
fair, therefore, to conclude that the words "such cities" as
used in this act mean cities of the class to which the one adopt-
ing the new form of government would legally belong under
the general laws of the state, because it is referring to the
general city incorporation laws of the state.    (*Kessler v.
Fritchman, ante,* p. 30, 119 Pac. 699.) · It is not our busi-
ness as a court to deal in any subtle refinements in construing
legislative acts, but it is rather our duty to ascertain, if pos-
sible, from a reading of the whole act the purpose and intent
of the legislature and give force and effect thereto.

The question next arises as to the class to which Boise City
would properly belong under the general laws of the state.
Sec. 2222 of the Rev. Codes provides as follows: "Any town
or village containing not less than two hundred nor more than
one thousand inhabitants, now incorporated as a city, town
or village, under the laws of this state, or that shall hereafter
become organized pursuant to the provisions of this title, and
any city of the second class which shall have adopted village
government as provided by law, shall be a village. . . . . ''
This section then provides that at the time of its adoption all
towns or villages then incorporated containing not less than
200 nor more than 1,000 population should thereafter be
known as villages and be governed by the statutes prescribing
the authority, powers and duties of village governments.    It
also provided that any town or village containing a population
of not less than 200 nor more than 1,000 might at its pleasure
become incorporated under the provisions of the village gov-
ernment act.    The act, however, contains no provision pro-
hibiting such a village from continuing to exercise the powers
and authority of village government merely by reason of its
growth exceeding the maximum population of 1,000, nor did it
provide any compulsory process or method whereby such a
village should be compelled to take on any new or different
form of government upon reaching the maximum population
of 1,000.    Sec. 2170 of the Rev. Codes provides as follows:

"All cities, towns and villages containing more than one thousand and less than fifteen thousand inhabitants shall be cities of the second class, and be governed by the provisions of this chapter, unless they shall adopt a village government as hereinafter provided."

It will be noticed from this section that all cities, towns and villages containing more than one thousand and less than fifteen thousand inhabitants become cities of the second class. Now, the legislature at the time of the adoption of the foregoing statute failed to make any specific provision for the classification, organization or government of cities with a population in excess of 15,000. This was probably due to at least two reasons: First, that the state did not at that time have any city organized under the general laws with a population of 15,000; and, secondly, the lawmakers probably intended that in the event any city should grow to that size, it could and should continue to exercise the powers and functions of a city of the second class. It is certain, at any rate, that they did not provide any other form of government or any other class for a city of greater population, nor did they anticipate that a city should become disorganized or disincorporated by reason of a growth which might cause its population to exceed 15,000. The same laws that were made applicable to govern such a city when it reached a population of 15,000 would be equally applicable when it reached a population of 15,100. Now, then, we find that Boise City, at the time it voted to suspend its charter and adopt the commission form of government was a city with a population in excess of 15,000. The question, therefore, arises: To what class would Boise City have belonged if it had been organized and operating under the general laws as they then existed? The answer is inevitable, that it would have been a city of the second class and would have belonged in that class. That was the highest class city known to the general laws of the state, and the laws applicable to cities of the second class would have been applicable to Boise City had it not been operating under a special charter. It will be no more difficult now for the officers of Boise City, acting under the commission govern-

ment act, to ascertain what the general laws are governing a city of the second class than it would have been for the officers of Boise City had it been operating under the general laws of the state as a second class city at the time it voted to adopt the commission form of government. Under the provisions of sec. 1 of the act, there are only two kinds of cities that can become incorporated under the commission government act. The first is a city of the second class as the same had been previously known under the general laws of the state (sec. 2170), and the second was a city operating under a special charter, and each of these cities, the one recognized and protected by the constitution and the other organized and classified by the general laws of the state, was subject to the classification applicable to both under the Black Law that they should have a population of at least 2,500 before they could enter the new classification and adopt the provisions of the new government act. (See *State v. Tausick,* 64 Wash. 69, 116 Pac. 651.)

There might be some good reason for the argument of counsel for appellant that there is uncertainty or obscurity in the act as to what general or other laws aside from the commission act should govern such cities, if it were not for the fact that sec. 3 specifically provides that no provisions of a special charter shall apply after a special charter city has adopted the new organization. If such a city is not to apply any of the provisions of its special charter, then it is clear that the legislature intended that it should apply the provisions of the general law applicable to a city of the class to which it did belong or would have belonged under the general laws. (*Kessler v. Fritchman, ante,* p. 30, 119 Pac. 699.)

3. It has been further argued that the submission of the question to the electors of Boise City was not in conformity with the requirements of sec. 1, art. 12, of the constitution, wherein it provided that cities and towns organized prior to the adoption of the constitution might become organized under the general laws when a "majority of the electors at a general election shall so determine under such provisions therefor as

may be made by the legislature.'' Counsel argue that the question should be directly submitted to the electors as to. whether they will suspend or surrender the special charter of such city. The question submitted to the electors of Boise City under the commission government act was as follows: ''Shall the proposition to organize the city of Boise under the laws of the eleventh session of the legislature of Idaho, approved March 13, 1911, and recorded at page 280, the Session Laws of said eleventh session, be adopted?'' It is not to be supposed that any elector, voting for the adoption of the new form of government, believed for a moment that the city was going to continue under the special charter if the new form of government should be adopted. The question would at once arise in the mind of the citizen when he came to voting on such a proposition as to whether he was getting something better or worse, and whether he should vote to retain the charter or would favor adoption of the new form of government. It should be observed that the constitution does not require the legislature to submit the question in any particular form, nor does it say that the vote shall be on the question of *abandoning the charter,* but it is rather on the question of *becoming* *''organized under the general laws,''* and the submission of the question is to be determined by the legislature ''under such provisions therefor as may be made by the legislature.'' The Black Law is a general and not a special law, and applies equally to all cities of the state having the required population that see fit to adopt its provisions by a popular vote.

4. It is lastly argued by counsel for appellant and also by one of the counsel who appears as *amicus curiae,* ''that the so-called Black Law, chap. 82 of the Laws of 1911, is in flagrant violation of the provisions of the federal constitution prohibiting the passage by the legislature of any law impairing the obligation of contracts.'' Counsel who appears as *amicus curiae* has filed a very able brief, setting forth in detail his objections to the Black Law and the particulars wherein he thinks it impairs the obligations of the city in regard to its bonded indebtedness. It is stipulated that the city at the

time it voted to adopt the commission form of government was indebted and that such indebtedness was evidenced by its coupon bonds. It is doubtful if this question can be properly raised by the appellant herein, but, notwithstanding any doubt there may be, we have concluded to waive any consideration of the manner and form in which this phase of the question has been presented and deal with it on its merits.

The vital question urged is that under the bonding acts special provision is made for the levying and collection of an annual tax for the payment of interest and raising a sinking fund for the final redemption of the bonds, and that these provisions became a part of the contract under which the city sold the bonds, and that they are impaired by the adoption of this new form of government, for the reason that the commission government act contains no provision for levying and collecting a tax to meet these obligations. It is further argued that the commission government act provides a method whereby all ordinances may be submitted to a popular vote, and that, although the city council might make a tax levy or be compelled by the courts to make such levy, still the people might refuse to cast a favorable vote, and there would be no method whereby a levy could be enforced and a tax could be raised to meet these obligations.

There are several reasons which to our minds satisfactorily answer these contentions. In the first place, it is a well-settled rule in this country that these municipal bond issues create contract obligations, and constitute a contract between the municipal corporation and the purchaser of the bonds. It is equally true that the remedies given by law for the enforcement of these contracts and the levying and collection of taxes to meet such obligations cannot be altered or diminished so as to impair the substantial rights or interests of the holder of such obligations. (*Von Hoffman v. City of Quincy,* 4 Wall. (U. S.) 535, 18 L. ed. 403; see notes and citations, 6 Notes to U. S. Rep. 632, and note, p. 706, 1 Supp. U. S. Notes.) If, therefore, the act here in question attempts to repeal the remedy given the bondholder by the ordinances which authorized the issuance of the bonds and provided for the levy

and collection of a tax, and does not give to the bondholder instead thereof a substantial, equivalent remedy, the act would in so far be unconstitutional and void. When we turn to the act itself, however, we find that it was clearly not the intention of the legislature to in any way alter or impair the obligation of the city in this respect but rather to continue those obligations in full force and effect. We find in sec. 3 of the act the following provision: "All rights and property of every description which are vested in any such city under its former organization shall vest in the same under the organization herein contemplated, and no right or liability, either in favor of or against it, existing at the time, and no suit or prosecution of any kind shall be affected by such change, and such city . . . . shall be subject to all the duties, obligations, liabilities and limitations now or hereafter imposed upon such municipal corporations by the constitution," etc. It is also provided by sec. 3 that all existing ordinances shall remain in force under the new government until altered or repealed. It is therefore clear that so far no attempt has been made to impair or repudiate the obligations created by Boise City. Under the foregoing provision, we think the bondholders have the same rights and remedies that they have always had for the collection of their bonds, and that the commission government act was never intended to in any way alter, change or impair those obligations.

Now, let us answer the contention made with reference to the referendum submission of a tax levy ordinance. An examination of the different provisions of the statute as embodied in secs. 25, 26, and 74 convinces us that it was the intention of the legislature to exclude "ordinances making the annual tax levy and appropriations" from the operation of the referendum provision (sec. 74, p. 313, 1911 Sess. Laws). Sec. 25 provides for the submission of any ordinance to a vote of the people, provided a proper petition therefor is filed with the clerk "prior to the date when any ordinance shall take effect"; and sec. 26 provides that the council of its own motion may submit any proposed ordinance or measure to a vote of the people in the same manner and with the same

force and effect as a question is submitted on petition. When we turn to sec. 74, prescribing when ordinances shall go into effect, we find the following: "Ordinances making the annual tax levy and appropriations shall take effect immediately upon their passage. Ordinances granting franchises of any kind shall take effect not less than thirty days after their passage and approval. All other ordinances enacted by the council shall take effect not less than ten days after the date of their passage," etc. As above noted, sec. 25 requires a referendum petition to be filed with the clerk *before the date when the ordinance shall take effect.* It is therefore clear that it could not have been the intention of the legislature that ordinances making the annual tax levy and appropriations should be submitted to a referendum vote. No possible method is provided for securing a petition touching such an ordinance until after it would be in effect. It seems to us that it must have been the intention of the lawmakers that ordinances making the annual tax levies and appropriations should not be submitted to a referendum vote. On the other hand, the people are given a certain length of time in which to procure petitions with reference to all other ordinances, namely, at least thirty days for ordinances granting franchises, and at least ten days for all other ordinances.

No sufficient or valid objection has been called to our attention to justify us in holding the act in question invalid or unconstitutional. It follows that the judgment should be affirmed, and it is so ordered. Costs awarded in favor of respondent.

Stewart, C. J., concurs.

SULLIVAN, J., Dissenting.—I am unable to concur in the conclusion reached by the majority of the court. I concede that the act known as the Black Law was passed by both houses of the legislature in substantial compliance with the provisions of the constitution in regard to what the journals of the two houses must contain, but that admission alone does not go to the constitutionality of the provisions of the act

itself; it only goes to the constitutionality of the passage of the act. In *Kessler v. Fritchman, ante,* p. 30, 119 Pac. 692, the majority of this court held under the provisions of sec. 2 of the Black Law, whereby the mayor is required upon petition to submit the question of organizing as a city under said act to the electors at a "special election," that the "special election" there referred to means the same as the term "general election" as used in sec. 1 of art. 12 of the constitution, which section requires that a change in the form of municipal government, if made, must be made at a *general* election. Construing the words "special election" to mean "general election" was the first step by the court in construing away the clear meaning of said act, and further judicial legislation, as I view it, is now indulged in by the majority opinion in order to sustain the constitutionality of said law.

(1) It is provided by said sec. 1, art. 12, of the constitution, that "the legislature shall provide by general laws for the incorporation, organization and classification of the cities and towns in proportion to the population," and in compliance with said provision, the legislature has classified municipalities into villages, cities of the second class and cities under special charter. It was the evident intention to provide a fourth classification under the Black Law.

The third section of the Black Law provides: "All general laws of the state of Idaho governing or pertaining to such cities and not inconsistent with the provisions of this act, shall apply to and govern cities organized under this act." It is conceded that there were no general laws of the state of Idaho governing or pertaining to Boise City at the time of the enactment of the Black Law, except sec. 2239, Rev. Codes, which provides that city councils, etc., of cities, towns and villages theretofore incorporated under special or general laws, or hereafter incorporated, are vested with authority and power to regulate or suppress and prohibit certain criminal acts. Boise City was organized and governed by a special charter, which charter could not be amended or changed by general law. And it is especially provided in said section 3 of the Black Law, "That no provisions of any special charter or other special act

or law which any such city may be operating under at the time of its becoming organized under this act shall thereafter be applicable to such city while it is operating under the provisions of this act.'' It thus clearly appears that if Boise City attempts to organize under the provisions of said Black Law, it would have only the powers granted by said sec. 2239 and the powers granted by the provisions of the Black Law, for under the provisions of said section 3, as above quoted, only the general laws "governing or pertaining" to Boise City and not inconsistent with the Black Law, are made applicable to Boise City after its organization under the Black Law. Sec. 11 of said Black Law provides that ''The council shall have and possess, and the mayor and council and its members shall exercise all executive, legislative and judicial power and duties now had, possessed and exercised by the mayor, city council, board of public works, board of library trustees, and other executive and administrative officers in cities, except as hereinafter provided.'' And it is thereinafter provided that no provision of any special charter or other special act or law has any application whatever to a city after it is organized under the Black Law. Therefore the mayor and council of Boise City would have no powers or duties imposed by the charter and only have such powers and duties as are imposed by the Black Law.

It appears from the conflicting provisions of the Black Law and its incongruities that it was hastily and carelessly drawn and will require legislation by this court to make it effective.

It will be observed by the adoption of the Black Law, Boise City would be deprived of the rights and powers now exercised under its special charter and essential to the maintenance of municipal government, as no rights and powers other than as above mentioned are conferred by said act upon Boise City for the reason that no general laws are applicable thereto. The Black Law was not intended of itself to be a complete law for municipal government, but had to be supplemented by the general laws by which the city adopting it was governed. Boise City was not under the general laws and was not a city of the second class, and under the law it

could not become such as it had a population of more than 15,000. It is conceded by the majority of the court that the general laws of the state do not provide for the organization of any cities that have a population exceeding 15,000, but they hold that if a city organized under the general laws continues to grow and acquire a population of more than 15,000, it still operates under the general laws provided for cities of the second class. I concede that, but it must be remembered that Boise City was never under the general laws and that it has grown to a city of perhaps 25,000 inhabitants under its special charter. That being true, it could not now organize under the general law because, as I view it, no city that has a population to exceed 15,000 can organize under the general laws. When it adopted the Black Law, there were no general laws governing or pertaining to Boise City, and only such general laws as govern and pertain to the city at the time it adopts the Black Law are applicable to such city, under sec. 3 of said act. I think the majority of the court evades the real facts of this case when it suggests that a city organized under the general laws, when it acquired a population of more than 15,000, would not be disorganized but would continue. I concede that proposition, but deny that Boise City could have become organized under the general law after it had a population of more than 15,000, and the very fact that the legislature has neglected and failed to provide general laws for the governing of cities of more than 15,000 inhabitants does not justify the court in extending the provisions of the general law for the government of cities of the second class beyond what was intended by the legislature, and thus judicially enacting laws for the government of such cities. After Boise City adopted the commission form of government, it had no power under its charter whatever, and, quoting from sec. 3 of the Black Law, "all general laws of the state of Idaho governing or pertaining to such cities (that is, cities adopting the Black Law) and not inconsistent with the provisions of this act, shall apply to and govern cities organized under this act." Boise City was not brought under the general laws by the adoption of the Black Law, for the reason that it was in no manner

governed by the general laws. That being true, this court must legislate in order to bring Boise City under the provisions of the general laws.

The main object or purpose of the Black Law was to make all of the powers of the city council subject at all times to popular referendum. It was to place the mayor and common council in a position so that they could not pass an ordinance and make it effective without referring it to a vote of the people, provided the people so desired. It provides for both the initiative and referendum.

(2) The next point is, Does the Black Law impair the obligation of contracts, and for that reason is it repugnant to the provisions of sec. 10, art. 1, of the federal constitution, which · provides, among other things, that no state shall pass any law impairing the obligation of contracts?

The majority of the court holds that the Black Law does not impair the obligation of contracts. It is admitted that Boise City has a large amount of indebtedness incurred under the provisions of its charter, and the charter provides adequate means whereby the levying and collecting of taxes to pay the interest and principal of such bonds was a duty imposed on the city council and was a duty that the council could be compelled by mandamus to perform. Subd. 10 of sec. 50 of said charter provides that the proper officers of said city must continue to assess and collect, on all taxable property within the limits thereof, the necessary taxes to pay said bonds and interest as the same become due.

It is a well-settled rule, and clearly stated in *Von Hoffman v. City of Quincy*, 4 Wall. (U. S.) 535, 18 L. ed. 403, as follows:

"Where a statute has authorized a municipal corporation to issue bonds and to exercise the power of local taxation in order to pay them, and persons have bought and paid value for bonds issued accordingly, the power of taxation thus given is a contract within the meaning of the constitution, and cannot be withdrawn until the contract is satisfied. The state and the corporation in such a case are equally bound."

There is no conflict of authority upon this point. Under the uniform decisions of the supreme court of the United States, statutory provisions may constitute a contract between the city and its bondholders incapable of impairment at the hands of the legislature. Under the provisions of the Boise City charter the contract rights of the bondholders were clear, specific and adequate. If the mayor and common council failed to levy the necessary taxes, they could be compelled by mandamus to do so. The city having borrowed money and issued its bonds, the legislature had no power to change the situation between the debtor and creditor without at the same time preserving in some way the rights of the contracting parties to enforce such contracts. The legislature might, if it chose, change the form of government of Boise City. It might abolish the office of mayor and council, but if it did that it must vest in some other officers the duty of levying the necessary taxes, and this duty must continue to be a duty or legal obligation, one whose performance could be enforced in the courts until the contracts of the city were complied with. But it could not make the levying of the required taxes depend upon the hazard of a popular vote, and if an attempt were made to make it depend upon a popular vote, such act would be absolutely null and void.

The Illinois legislature attempted in the case of *Von Hoffman v. City of Quincy, supra,* to change the method of levying sufficient taxes for the payment of the city's bonded indebtedness without substituting therefor a remedy as efficient as the law provided when the bonds were issued, and that act was held by the supreme court of the United States to be absolutely void.

While the Black Law provides for a mayor and council, it does not charge the council with the duty of levying taxes to meet the bonded indebtedness or any indebtedness. The majority opinion quotes from sec. 3 of the Black Law, whereby it is provided that all rights and property of every description which are vested in any city under its former organization shall vest in the same under the organization contemplated by said act, and that such new organization

"shall have and exercise all powers, functions, rights and privileges now or hereafter given or granted it and shall be subject to all the duties, obligations, liabilities and limitations now or hereafter imposed upon such municipal corporation," etc. It cannot be claimed that any provisions of the special charter for levying and collecting taxes remained in force after the adoption of the Black Law. The provisions of said sec. 3 absolutely extinguish the special charter in the following language: "Provided: That no provisions of any special charter or other special act or law which any such city may be operating under at the time of its becoming organized under this act, shall thereafter be applicable to such city while it is operating under the provisions of this act." The Black Law nowhere contains any provisions requiring the councilmen or any other officer to levy any tax to meet the requirements of the existing bond issues. If the general laws of the state governing second-class cities stood alone, they impose upon the municipal officers a lawful duty in respect to levying taxes to pay the indebtedness of the city, substantially equivalent to that imposed by the special charter. But the general laws do not stand alone. By the Black Law they have been adopted only in so far as they are "not inconsistent with the provisions of this act." (See sec. 3.) Under the general law and under the special charter there was an imperative duty imposed on the proper officers to levy taxes for the purpose of paying the bonded indebtedness. Those officers had no alternative in the matter, and as above stated, if they refused to do so they could be compelled by *mandamus.* The Black Law, however, annihilates this legal obligation so far as its practical availability to the creditor is concerned, as it puts the decision as to whether or not taxes shall be levied in the hands of the voters of the city; in other words, the question as to whether or not the contract obligations of the city shall be met may, in strict accordance with the provisions of the Black Law, be determined by the legal voters of the city, who cannot by any known process of law be compelled to vote in favor of levying the tax. But it has been suggested that you could trust the people to do this—that

they are honest. Conceding it: that is not the question here. The bondholder had the right to an adequate remedy not dependent upon the will or wish of the voter—a remedy as adequate and effective as he had when the bonds were issued under the special charter. There is no question as to the electors' honesty involved here. The power and duty of the council under the Black Law in regard to the levying of taxes is only such power and duty as the voters of the city choose at any time to leave in their hands. This remarkable situation is caused by the loose, sweeping provisions in which the legislature embodied what is known as the "initiative and referendum" in said act.

Sec. 25 of the act provides as follows: "If, prior to the date when any ordinance shall take effect, a petition, which petition, and its requirements shall be substantially as required by the provisions of sec. 17 of this act, with the necessary changes made therein to meet the needs of this section, signed by qualified electors equal in number to twenty-five (25) per centum of the entire vote cast for mayor at the last preceding general municipal election, shall be filed with the clerk protesting against the enactment of such ordinance, it shall, by the filing of such petition, be suspended from taking effect. . . . . Thereupon the council shall immediately reconsider such ordinance, and, if it do not entirely repeal the same, shall submit it to popular vote at the next municipal election; the council, in its discretion, may call a special election for that purpose; and such ordinance shall not take effect unless the majority of the qualified electors voting thereon at such election shall vote in favor thereof."

This section also emphasizes the carelessness with which said act was drawn. It provides that the petition referred to therein shall be substantially as required by the provisions of sec. 17 of said act. Turning to sec. 17, we find that it does not refer to petitions at all, but provides for the general and special meetings of the council and the time for holding the same, and contains nothing in regard to petitions.

It is evident in case the council levies a tax to meet the requirements of any bond issues, their action may neverthe-

less, in strict observance of the forms of law, be reviewed by the people at large, and if for any reason whatever the people choose to vote against the levying of such tax, then the levy could not take effect. Suppose a proposed ordinance was sought to be enacted by the initiative as provided by sec. 24 of said act, providing that no tax be levied for the year 1913 for the payment of the interest on said bonded indebtedness. Under the Black Law it would be the duty of the council to pass it or submit it to the electors for passage, as there are no exceptions to the enactment of ordinances under the initiative. After the people had enacted such an ordinance the council would not dare, nor would they have any authority, to repeal it by enacting an ordinance levying such tax. If they undertook to do so, they no doubt would be recalled. In that case the remedy of *mandamus* or any other remedy would not be an adequate remedy to the bondholder.

But it is contended that sec. 74 of the Black Law provides that ''Ordinances making the annual tax levy and appropriations shall take effect immediately upon their passage,'' and it is urged that when they take effect it is too late to refer them to a vote of the people. Conceding that, there are various ways by which the provisions of said section might or could be evaded. First, it is not required by law that a tax levy to meet the requirements of a bond issue shall be a part of the ''annual tax levy,'' and the council might, if it chose, make such levy at a separate and different meeting. And again: Sec. 26 of said act provides that ''The council, of its own motion, may submit to popular vote, for adoption or rejection, at any election any proposed ordinance or measure [no exception] in the same manner and with the same force and effect as provided in this act for their submission on petition.'' That section places it in the hands of the council of its own motion to submit to popular vote ''any proposed ordinance or measure'' in the same manner and with the same force and effect as provided in said act for their submission on petition. Supposing the council should submit the ordinance for the purpose of levying a

tax to. pay the indebtedness of the city to a vote of the people; they would be bound by the vote of the people under the provisions of said law. But the majority of the court has really read into said section after the words, "any proposed ordinance," the words, "except ordinances whereby taxes are levied- to meet contract obligations," and I think that is the clearest judicial legislation.

When this law was submitted to the people of Boise City for adoption or rejection, the whole law was submitted, and the history of that election shows that one of the main inducing causes of its adoption as proclaimed by its advocates was that under this law the sole power of legislation and of conducting the city's business would be vested in the people of the city. And no doubt many of the people believed from the statements made that if the Black Law were adopted, an opportunity would be given to abrogate- or repudiate certain contracts, such as the lighting contract which had been recently entered into by the city and of which some people did not approve.

Under the Boise City charter, the legislature had provided for a mayor and common council, always amenable to the process of *mandamus.* This was the remedy and a .part of the contract on which the bondholders and creditors of the municipality relied. In its place, under the Black Law, no officer is amenable in any practical way to the process of *mandamus* so far as the passage of ordinances is concerned, but the ultimate power over all ordinances and other measures is vested in the decision of the electors of the city. The only power vested in the council is such power as the people choose to leave with it. The creditors of the city had a contract they could enforce in the courts under the charter, but under the provisions of the Black Law the enactment of ordinances levying taxes for the purpose of paying the indebtedness may be left to a vote of the people, in case the council desire to leave it with the people or in case the people desire to vote upon it. Under such a condition, what becomes of the contract right of the bondholders? It is a mere hope or expectation that the people will never vote to

repudiate its municipal obligations. The bondholders had an adequate remedy under the provisions of the special charter, and any act of the legislature that deprives them of that right is unconstitutional and void.

The court, in *Von Hoffman v. City of Quincy, supra,* said: "When the bonds in question were issued there were laws in force which authorized and required the collection of taxes sufficient in amount to meet the interest, as it accrued from time to time, upon the entire debt. But for the act of the 14th of February, 1863, there would be no difficulty in enforcing them. The amount permitted to be collected by that act will be insufficient. . . . . A right without a remedy is as if it were not. For every beneficial purpose it may be said not to exist. It is well settled that a state may disable itself by contract from exercising its taxing power in particular cases. It is equally clear that where a state has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. . . . . A different result would leave nothing of the contract but an abstract right —of no practical value—and render the protection of the constitution a shadow and a delusion."

In the state of Louisiana, after an obligation had been incurred, a statute was passed forbidding, among other things, the issuance of a writ of mandate to enforce the tax levy for its payment, and in the case of *Louisiana v. Pilsbury,* 105 U. S. 278, 26 L. ed. 1090, the court said:

"When the contract was made, the writ [of *mandamus*] was the usual and the only effective means to compel the city authorities to do their duty in the premises, in case of their failure to provide in other ways the required funds. There was no other complete and adequate remedy. The only ground on which a change of remedy, existing when a contract was made, is permissible without impairment of the contract, is that a new and adequate and efficacious remedy be substituted for that which is superseded. Here, no remedy whatever is substituted for that of *mandamus.*"

In the case at bar, the legislature has undertaken to do indirectly what it could not do directly. They have made the writ of *mandamus* ineffective by reason of authorizing the question as to whether a tax levy shall be made to be submitted to the electors of the city, which abolishes the writ of *mandamus* as effectively as though it had done so in express words. The writ of mandate would be of no avail against the voters of the city, and there is no way of preserving the contract obligations referred to except by judicially repealing a part of the act in question.

In the last-cited case the court said: "When the bonds were issued and taken by the creditors a contract was consummated between them and the city as fully as if all the provisions had been embodied as express stipulations in the most formal instrument signed by the parties. On the one hand, the creditors surrendered their debts against the former municipalities; and, on the other hand, in consideration of the surrender, the city gave to them its bonds, which carried the pledge of an annual tax of a specified amount for the payment of the interest on them, and ultimately of the principal. The annual tax was the security offered to the creditors; and it could not be afterward severed from the contract without violating its stipulations, any more than a mortgage executed as security for a note given for a loan could be subsequently repudiated as forming no part of the transaction. Nearly all legislative contracts are made in a similar way. The law authorizes certain bonds to be issued, or certain work to be done upon specified conditions. When these are accepted, a contract is entered into imposing the duties and creating the liabilities of the most carefully drawn instrument embodying the provisions."

In *Mobile v. Watson*, 116 U. S. 289, 6 Sup. Ct. 398, 29 L. ed. 620, the supreme court of the United States said:

"The remedies for the enforcement of such obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or if they are changed a substantial equivalent must be provided."

It requires no argument to show that the value of a contract is manifestly impaired when its payment cannot be enforced in a court. What would be the effect on negotiable paper if it were left by law to the payer to vote whether he would pay his obligation or not? This is no reflection on the honesty of anybody, but it is simply a question of obligation of contracts and their enforcement in the courts, if necessary.

Quoting further from *Von Hoffman v. City of Quincy,* *supra,* the court said:

"Nothing can be more material to the obligation than the means of enforcement. Without the remedy the contract may, indeed, in the sense of the law, be said not to exist, and its obligation to fall within the class of those moral and social duties which depend for their fulfillment wholly upon the will of the individual. The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the constitution against invasion."

It was held in *People v. Bond,* 10 Cal. 563, that a creditor has a right to the substance of the contract as he made it. It is his privilege to judge for himself whether it is for his interest for the agreement to be discharged in the particular way stipulated, or in a different mode; and neither the courts nor the legislature can change it in any substantial particular.

The powers of the council under the Black Law are only such as are provided by the grant contained in the law itself, including whatever grants or power contained in the general law are made applicable by the Black Law, but in no event or under no circumstances do any of the old powers created by the Boise charter survive to the new council, because all of the provisions of the charter were absolutely suspended by said Black Law. As stated by counsel, *amicus curiae,* we have no fears that the people of Boise would ever vote to repudiate contract obligations; but it is quite possible that irresponsible agitators may call elections on questions involving municipal obligations and thus injure the city's credit and the value of its securities. Under the Black Law

it costs the petitioners nothing to require the council to call an election under the initiative or referendum. The fact that the people would vote down any attempt at repudiation is a very different and inferior kind of protection to that afforded by responsible officers with their duties defined by law and themselves amenable to the process of the courts. It is not sufficient to say that the referendum would not be invoked in respect to tax levies to meet bonded indebtedness, as the council may, on its own motion, submit that question to the electors under the provisions of sec. 26 of said act. It was held in *Curtin v. Benson*, 222 U. S. 78, 32 Sup. Ct. 31, that whether a power is within constitutional limits is to be determined by what *can* be done under it, not what *may* be done.

Said act is repugnant to the provisions of sec. 10, art. 1, of the federal constitution.

In order to sustain said Black Law, my associates had to construe the words "special election," as used in sec. 3 of the Black Law, to mean the same as the words "general election," as used in sec. 1, art. 12, of the constitution; and have also construed the words "less than 15,000 inhabitants" (that being the maximum for second-class cities), to mean twenty or twenty-five thousand, or any number more than fifteen thousand. They have removed the maximum placed by the legislature. They have also been required to construe the phrase, "any ordinance or measure," as used in sec. 26 of said act, to mean "any ordinance or measure except certain ordinances and measures for levying taxes," and this construction is judicial legislation, pure and simple. It has construed plain, ordinary words and language to have an extraordinary and unnatural meaning, and carries the rule of construction past any limit, and such construction implies ignorance on behalf of the legislature of the meaning of plain and simple words in common, every-day use.

The court erred in refusing to grant the injunction as prayed for in the complaint.